UPON REHEARING EN BANC
KELSEY, Judge.
Joshua Davis Kyer challenges on appeal his burglary and larceny convictions, claiming police unlawfully entered his mother’s apartment where he lived and obtained incriminating evidence in violation of the Fourth Amendment. We agree with Kyer that no warrant exception justified the police entry into the apartment. But we also agree with the trial court that, once inside, the police searched the apartment only after receiving permission from Kyer’s mother to do so. This consent, the trial court correctly held, was “sufficiently an act *477 of free will to purge the primary taint.” Wong Sun v. United States, 371 U.S. 471, 486, 83 S.Ct. 407, 416-17, 9 L.Ed.2d 441 (1963).
I.
“On appeal from a denial of a suppression motion, we must review the evidence in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences.” Slayton v. Commonwealth, 41 Va.App. 101, 103, 582 S.E.2d 448, 449 (2003).
At about 2:00 a.m. on August 26, 2002, Officer B.E. Davis and Detective Brent Story responded to a burglar alarm at the Southside Speedway. They saw two suspects running from the scene. They caught one, but the other got away. With a tip from the detained suspect, the officers’ investigation led them to the Kyer apartment.
The officers arrived at the apartment at approximately 4:00 a.m. The ft-ont door of the apartment was open wide enough for an individual to “walk through it without touching the door.” There were no lights on. In this particular area, Detective Story observed, “it was not uncommon for this situation to occur.” “Every time it does,” he testified, “we make entry to make sure everything inside is okay.” They knocked on the door several times, waited a couple of minutes, and then went inside with weapons drawn and flashlights on. Fearing someone had “forced entry or broken into the home,” the officers conducted a two to three minute “cursory” protective sweep looking for any possible intruders.
After completing the protective sweep, Officer Davis awoke Kyer’s mother, who was still asleep in her bedroom. Davis identified himself, inquired about her well-being, and asked if anyone else was “supposed to be in the house.” She told him she lived there alone with her two sons. When asked if “she was okay,” she replied “she was fine.” During this conversation, Detective Story waited in the living room. Officer Davis left her bedroom to permit her to “get herself together.” He went back into the living room and waited with Detective Story. Kyer’s mother came out and then “excused herself to *478 go back into her bedroom” before again reappearing to speak with the officers about ten minutes later. By this time, Kyer’s brother had joined the officers in the living room after being awoken by them. No one else was in the apartment.
Detective Story sat down in a chair across from Kyer’s mother and explained “what was going on and why [they] had been there originally and also explained to her why [they] came in in the first place so she would understand that.” She told the officers “everything was okay” and that she had been asleep. The officers also advised her about the Southside Speedway incident and the suggestion that her son may have been involved. She said she thought he was home all night and was still there.
After she had been briefed on the situation, Officer Davis then asked Kyer’s mother for permission to search for “anything that was stolen from the Southside Speedway.” She consented to the search. In the loft where Kyer normally slept, Officer Davis found several items stolen during the burglary of the Southside Speedway.
Kyer was charged with three counts of statutory burglary and three counts of petit larceny. Kyer moved to suppress the inculpatory evidence found in his bedroom, arguing that the officers’ initial entry into the apartment was unlawful. That warrantless entry, Kyer argued, nullified the subsequent consent to search given by his mother. The trial court rejected both arguments.
The initial entry, the court held, fell within the “community caretaker doctrine and/or exigent circumstances” exception to the warrant requirement. The court found the officers’ subjective intent in entering the apartment was motivated by their good faith desire to ensure an intruder had not come through the opened front door. Finding the officers’ testimony credible, the court found they were not “acting under a pretext” to gain entry into the apartment to continue their investigation of the Southside Speedway burglary.
The trial court also held that, even if the initial entry fell outside the community caretaker or emergency exceptions, *479 Kyer’s mother voluntarily consented to the search and “the totality of the circumstances are not sufficient to have vitiated her consent.” “So, on that ground, irrespective of what decision the Court might reach on the question of exigent circumstances or exercising community caretaker function, the consent was valid.”
Following the trial court’s ruling on the suppression motion, Kyer stipulated that the evidence was sufficient to prove his guilt on all charges. Upon being convicted, Kyer appealed to us challenging the trial court’s denial of his suppression motion. A panel of our Court held the community caretaker doctrine authorized the initial entry into the apartment, thereby mooting any need to examine the legal efficacy of the later consent to search. Kyer v. Commonwealth, 43 Va.App. 603, 601 S.E.2d 6 (2004).
Having reconsidered the matter en banc, we hold the initial entry cannot be justified under the emergency or community caretaker doctrines and thus the consent issue must be decided. And, on that point, we agree with the trial court that the consent was not nullified by the earlier unlawful entry.
II.
“Though the ultimate question whether the officers violated the Fourth Amendment triggers de novo scrutiny, we defer to the trial court’s findings of ‘historical fact’ and give ‘due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.’ ” Slayton, 41 Va.App. at 105, 582 S.E.2d at 449 (quoting Barkley v. Commonwealth, 39 Va.App. 682, 689-90, 576 S.E.2d 234, 237-38 (2003)). Thus, we must give “deference to the factual findings of the trial court” and “independently determine” whether those findings satisfy the requirements of the Fourth Amendment. Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463, 464 (2003).
To prevail on appeal, “the defendant must show that the trial court’s denial of his suppression motion, when the evidence is considered in the light most favorable to the *480 prosecution, was reversible error.” Id. In other words, on appeal, the “burden to establish that the denial of the motion to suppress constituted reversible error rests with the defendant.” King v. Commonwealth, 39 Va.App. 306, 308, 572 S.E.2d 518, 519 (2002) (citation omitted).
A. The Initial Entry
Among the many interests served by the Fourth Amendment, the privacy interest in one’s home has few equals. “At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.” Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 2041, 150 L.Ed.2d 94 (2001) (citation and internal quotation marks omitted). “It is axiomatic that the ‘physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.’ ” Welsh v. Wisconsin, 466 U.S. 740, 748, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984) (citation omitted). But even on this topic the Fourth Amendment’s text endorses no absolutes. It instead condemns only “unreasonable” searches and seizures.
One concession to reasonableness, the emergency exception, recognizes the “right of the police to enter and investigate” when someone’s health or physical safety is genuinely threatened. Reynolds v. Commonwealth, 9 Va.App. 430, 437, 388 S.E.2d 659, 664 (1990) (citation omitted); see also Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). It rests on the commonsense rationale that “preservation of human life is paramount to the right of privacy” protected by the Fourth Amendment. Reynolds, 9 Va.App. at 437, 388 S.E.2d at 664 (citation omitted). This concern parallels one of the applications of the community caretaker exception, which recognizes that “police owe ‘duties to the public, such as rendering aid to individuals in danger of physical harm, reducing the commission of crimes through patrol and other preventive measures, and providing services on an emergency basis.’ ” Id. at 436, 388 S.E.2d at 663.[1]
*481 In this case, however, we need not engage in any extended analysis of the emergency or community caretaker exceptions. Nor need we elaborate on their various formulations. We believe the facts would not justify an objectively reasonable officer to think either exception applied.[2] Stripped of its immaterial aspects, the fact pattern in this case includes only one arguably suspicious circumstance: an open door on an August night.
There were no signs of forced entry — such as pry marks, mangled locks, broken hinges, or disfigured door jams.[3] No one called out for help. No sounds or observations suggested panic or danger within the apartment. There were no reports from neighbors about any unique medical concerns or other vulnerabilities of the apartment’s occupants. Nor did any of Kyer’s neighbors report any suspicious circumstances suggest *482 ing foul play. Cf. Hill v. Commonwealth, 18 Va.App. 1, 4, 441 S.E.2d 50, 51 (1994) (finding exigent circumstances existed when a neighbor reported that the homeowner “had been out of town for two days” prior to the police discovery of an open front door, leading the neighbor to fear “the house had been burglarized”).
The mere discovery of an “open door” of a residence— absent some other reason for concern — “is not, in and of itself, a circumstance that could give rise to a reasonable belief that entry is necessary to prevent harm to persons or property.” State v. Christenson, 181 Or.App. 345, 45 P.3d 511, 513 (2002) (emphasis added). “It is simply too common an event to create a concern of harm in the absence of other signs of trouble, such as evidence of a forced entry or a medical emergency; here, there were no such indications.” Id[4] In short, when the “only evidence of an emergency was a door left open late on a summer night,” we agree with other courts that “regardless of what the officers may subjectively have thought, a reasonable person would not believe an emergency existed.” State v. Swenson, 59 Wash.App. 586, 799 P.2d 1188, 1190 (1990); see also State v. Ryon, 137 N.M. 174, 108 P.3d 1032, 1047 (2005) (noting that, under the emergency assistance doctrine, an “open door ought not be viewed as a general invitation to enter”). The police had no legal right, therefore, to enter the Kyer apartment uninvited. The trial court erred in concluding otherwise.
*483 B. The Consent To Search
As a general rule, “a search authorized by consent is wholly valid.” Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). Consent loses its validity only if it is involuntary, Ohio v. Robinette, 519 U.S. 33, 40, 117 S.Ct. 417, 421-22, 136 L.Ed.2d 347 (1996), or the product of a manipulative “exploitation” by the police of an earlier unconstitutional search or seizure. Wong Sun, 371 U.S. at 488, 83 S.Ct. at 418; Warlick v. Commonwealth, 215 Va. 263, 266, 208 S.E.2d 746, 748 (1974).
Consent following an unconstitutional act, however, can still be valid if it is “sufficiently an act of free will to purge the primary taint.” Brown v. Illinois, 422 U.S. 590, 597, 95 S.Ct. 2254, 2258, 45 L.Ed.2d 416 (1975) (citing Wong Sun, 371 U.S. at 486, 83 S.Ct. at 417). This attenuation principle should not be confused with a mere “but for” standard of causation — which, if used for this purpose, would suppress evidence “simply because it would not have come to light but for the illegal actions of the police.” Wong Sun, 371 U.S. at 488, 83 S.Ct. at 418. Instead, “a finding with respect to attenuation ... can only be made after consideration of all the circumstances of the case.” United States v. Wellins, 654 F.2d 550, 554 (9th Cir.1981). This necessarily requires a “careful sifting of the unique facts and circumstances of each case.” Schneckloth, 412 U.S. at 233, 93 S.Ct. at 2051. There being no fixed formula, courts consider the amount of time between the illegal action and the acquisition of the evidence, the presence of intervening circumstances (like consent), and the purpose and flagrancy of the official misconduct. United States v. Seidman, 156 F.3d 542, 548 (4th Cir.1998).
Consistent with these principles, voluntary consent — when sufficiently an act of free will to dissipate the taint — can provide an independent basis for admitting evidence despite an earlier unlawful entry by police. See, e.g., Seidman, 156 F.3d at 549 n. 10 (“We see no reason why [consent] could not also sever the connection between an unlawful act and the acquisition of additional evidence. Indeed, voluntary consent *484 is the quintessential act of free will.”); United States v. Dickson, 64 F.3d 409, 410-11 (8th Cir.1995) (holding that defendant’s voluntary consent to search his apartment dissipated taint of prior illegal search); United States v. Valencia, 913 F.2d 378, 382 (7th Cir.1990) (“Even assuming the initial entry was illegal, we agree with the district court that that entry did not taint Valencia’s subsequent consent.”); United States v. Sheppard, 901 F.2d 1230, 1234 (5th Cir.1990) (holding that defendant’s voluntary consent to search his car dissipated taint of officer’s illegal entry); State v. Owen, 453 So.2d 1202, 1207 (La.1984) (holding that consent was valid despite “close temporal proximity between the illegal entry and Evans’ consent” because Evans had “knowledge of the purpose of the entry and the manner in which it was made” and thus the “official misconduct had an insignificant effect on the subsequent consent”).[5]
On the other hand, the purgation of free will may not suffice in all cases of consent. It may be insufficient, for example, when the evidence has already been discovered before the consent during the prior illegal search. See, e.g., Wood v. Commonwealth, 27 Va.App. 21, 30-32, 497 S.E.2d 484, 488-89 (1998); Commonwealth v. Ealy, 12 Va.App. 744, 757-58, 407 S.E.2d 681, 689-90 (1991). It may be equally insufficient if given after the consenter has been illegally detained, Davis v. Commonwealth, 37 Va.App. 421, 433-35, 559 S.E.2d 374, 379-80 (2002), or after the police make an illegal entry for the “very purpose” of obtaining consent, Walls v. Commonwealth, 2 Va.App. 639, 655, 347 S.E.2d 175, 184 (1986). Absent such exploitive circumstances, however, a consensual encounter following an “illegal entry” can still be “sufficiently independent *485 of the unlawful invasion to purge any taint arising from the initial entry.” Seidman, 156 F.3d at 547.
In this case, Kyer does not contend on appeal that his mother’s consent was involuntary. He argues only that, even if her “consent was voluntary,” it still was not “sufficiently an act of free will to purge the primary taint” of the unlawful entry. We disagree. Before she consented to the search, Kyer’s mother had been fully briefed by the police about “what was going on” and why they entered her apartment in the first place. The conversation took place in her living room, after she had about ten minutes to compose herself. At no time prior to the consent did the police recover any incriminating evidence. Nor did they in any way imply she was the subject of a criminal investigation. They did not detain her, place her in custody, threaten her with arrest, or restrict her freedom of movement in any way.
In these respects, our case parallels the situation addressed in Valencia, 913 F.2d at 382, where the United States Court of Appeals for the Seventh Circuit observed that the police
did not exploit the initial entry. The police found no evidence as a result of that entry, and discovered no information that they used (or could use) to influence Valencia to consent to a search. Valencia points to the allegedly coercive effect of the officers’ mere presence in his apartment. However, as we have seen, the district court found Valencia’s consent to be free and voluntary. Implicit in this finding is the conclusion that the officers’ presence did not coerce Valencia’s consent. Indeed, the district court explicitly found no evidence of any nexus between the initial entry and the consent.
Id. (emphasis added). “Given all these factors,” the Seventh Circuit held in Valencia, “we conclude that Valencia’s consent was sufficiently independent of the allegedly illegal initial entry that the two events were ‘so attenuated as to dissipate [any] taint’ from the entry.” Id. (quoting Segura v. United States, 468 U.S. 796, 805, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984)).
*486 We acknowledge that seeing two police officers, with weapons drawn, conduct a protective search of one’s home would no doubt be an intimidating sight. But Kyer’s mother saw none of that. She was asleep until awoken by Officer Davis. As the trial court found, this “was not a situation where they had guns drawn pointed at her head, asking her for consent.” Nor is this a case where the officers entered for the “very purpose” of obtaining consent. Walls, 2 Va.App. at 655, 347 S.E.2d at 184. They entered because they believed the open door implied danger to those inside. Having weighed their credibility, the trial court found their explanation truthful and rejected the argument that the officers used this story as a mere pretext to gain entry into the house to investigate the Southside Speedway burglary. Bound by this factual finding, we see no reason to conclude the “purpose and flagrancy of the police misconduct,” Wood, 27 Va.App. at 30, 497 S.E.2d at 488, should invalidate the voluntary consent to search given by Kyer’s mother.
The main circumstance disfavoring this conclusion is the relatively short duration between the entry and consent. We think two observations answer that legitimate concern.
First, the specific length of time was all but irrelevant from the perspective of Kyer’s mother. She was asleep when the police entered the apartment. She remained asleep as they conducted a protective search. When Officer Davis awoke her, she did not know whether the police had been there for a few minutes or a few hours. Her concededly voluntary consent did not depend in any way on the duration of the officers’ presence in her apartment. That is, nothing about the situation suggests that Kyer’s mother would have been more readily inclined to consent had she known the officers had been in her apartment longer than they in fact were. Cf. State v. Quinn, 290 Or. 383, 623 P.2d 630, 638 (1981) (finding defendant’s consent was unaffected by prior illegal search because, as defendant was unaware of the illegal search, his consent was “uninfluenced and untainted by the earlier unlawful act”).
*487 Second, as for the ten minutes or so between being awakened and providing consent, Kyer’s mother took that time to compose herself and to listen to the officers explain why they came to her apartment and why they entered it uninvited. By itself, however, this brief duration does not put the attenuation inquiry to an end. It is just one of several considerations. Even a very short duration need not negate the efficacy of a voluntary consent. See, e.g., Seidman, 156 F.3d at 548 (finding a few minute period between entry and consent insufficient to negate consent); Sheppard, 901 F.2d at 1235 (“Even though the time span between the challenged conduct and Sheppard’s consent was short, we cannot find that the second search resulted from the exploitation of the challenged conduct.”); Owen, 453 So.2d at 1207 (holding that consent was valid despite “close temporal proximity” between the illegal entry and consent).
III.
In sum, we hold that the trial court erred in finding the initial police entry into the apartment could be justified under the emergency or community caretaker exceptions. We find no fault, however, with the court’s alternative finding that the voluntary consent to search given by Kyer’s mother was “sufficiently an act of free will to purge the primary taint.” Wong Sun, 371 U.S. at 486, 83 S.Ct. at 417. The trial court, therefore, correctly denied Kyer’s motion to suppress.

Affirmed.

. Under proper circumstances, both doctrines apply not only to the protection of human life or to avoid serious injury, but also to the protection of property interests. See, e.g., Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949-50, 56 L.Ed.2d 486 (1978) (concluding the need to protect property may justify a warrantless entry of premises); see also United States v. Johnson, 9 F.3d 506, 510 (6th Cir.1993) (finding warrantless entry into house reasonable to "prevent the loss or destruction of the owner’s property” where kitchen window was broken and neighbor reported burglary in progress); United States v. Dart, 747 F.2d 263, 267 (4th Cir.1984) (upholding initial warrantless entry of warehouse where locks sawed off and doors forced open).

. We acknowledge, as the trial court found, that the officers did not act “under a pretext” and truly believed the circumstances justified a warrantless entry. As a general rule, however, an "officer’s state of mind (except for the facts that he knows) is irrelevant” to the Fourth Amendment inquiry. Devenpeck v. Alford,-U.S.-,-, 125 S.Ct. 588, 593, 160 L.Ed.2d 537 (2004); Slayton, 41 Va.App. at 109, 582 S.E.2d at 451.

. The Commonwealth also conceded at trial that, under the facts of this case, neither officer could reasonably assume Kyer returned home to commit “a crime in his own residence.” As the prosecutor put it: "I don’t think that's the assumption that they made----I think certainly they’re not looking at it as Mr. Kyer broke into his own residence, but that some other person or some other harm has befallen whoever is remaining inside.”

. The tenuousness of the open door inference in Christenson disqualified it from satisfying a statutory “community caretaking” exception to the warrant requirement, Christenson, 45 P.3d at 512-14, as well as an analogous emergency exception recognized by the Oregon constitution, id. at 514-15. Even so, the Fourth Amendment relevance of Christen-son (cf. post at 18-20) appears at the heart of its analysis: “We have held that an open front door does not justify entry into a house under the emergency aid doctrine or the community caretaking exceptions to the warrant requirement of the Fourth Amendment to the United States Constitution under more suspicious circumstances than those that existed here." Id. at 513 (citing State v. Bramson, 94 Or.App. 374, 765 P.2d 824 (1988); State v. Apodaca, 85 Or.App. 128, 735 P.2d 1264 (1987)).

. For similar reasons, a voluntary confession can be an act of free will sufficient to purge the taint of an earlier illegal arrest. See New York v. Harris, 495 U.S. 14, 21, 110 S.Ct. 1640, 1644-45, 109 L.Ed.2d 13 (1990). Voluntary statements made after an unlawful roadblock likewise need not be suppressed. Burns v. Commonwealth, 261 Va. 307, 324 n. 11, 541 S.E.2d 872, 884 n. 11 (2001). So, too, an illegal entry into a home does not negate the lawfulness of the later search if it did not rely on information obtained during the prior illegal entry. Segura v. United States, 468 U.S. 796, 815-16, 104 S.Ct. 3380, 3390-91, 82 L.Ed.2d 599 (1984).