COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, McClanahan and Senior Judge Bumgardner
Argued at Richmond, Virginia


MICHAEL ANTHONY GOODE

                                                MEMORANDUM OPINION[*] BY
v.        Record No. 1022-07-2           JUDGE ELIZABETH A. McCLANAHAN
                                                      MAY 6, 2008
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                            Bradley B. Cavedo, Judge[1]

              Karen L. Stallard, Supervising Appellate Defender, for appellant.

              Joanne V. Frye, Assistant Attorney General (Robert F. McDonnell,
              Attorney General, on brief), for appellee.


       Michael A. Goode appeals his convictions of possession of cocaine with intent to

distribute and possession of marijuana.  He argues the trial court should have suppressed

evidence discovered during illegal searches of and entry into the motel room in which he was

staying.  We agree and reverse the trial court.

                                    I.  BACKGROUND

       "'On appeal from a denial of a suppression motion, we must review the evidence in the

light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences.'"

Slayton v. Commonwealth, 41 Va. App. 101, 103, 582 S.E.2d 448, 449 (2003) (quoting Barkley

v. Commonwealth, 39 Va. App. 682, 687, 576 S.E.2d 234, 236 (2003)).

_____

       [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

       [1] With the exception of the entry of the trial and sentencing orders, the Honorable
Thomas N. Nance, Judge Designate, presided over the proceedings addressed in this opinion.

At approximately 1:30 to 2:30 a.m., Officer Jason Norton of the Richmond Police Department was dispatched to a location where an individual reportedly needed assistance. Officer Norton, accompanied by Officer Chris Schneider, responded to the call and spoke to the individual who said he had "relapsed on a drug addiction" and had been in two rooms of a nearby motel all afternoon long and into the evening hours. The individual, later identified as Petty, explained he left some personal items in those rooms. The officers followed Petty to the motel and knocked on the first door. When Officer Norton asked the individual who opened the door if Petty left his bicycle and wallet in the room, the individual let the officers and Petty retrieve the items.

Petty led the officers to another motel room where Officer Norton knocked and announced himself as "Richmond Police" numerous times. Although the curtains were closed, Norton could see an opening at the top of the window and could also see there was a light on. He climbed upon an iron railing to look into the opening at the top of the window above the curtains to see if anybody was in there and saw Goode lying on the bed face down with his hands underneath his pillow. Officer Norton then knocked on the window with his flashlight and again announced himself repeatedly. Officer Schneider was also knocking on the door with his baton and announcing himself. This knocking went on for approximately eight to ten minutes. While Officer Norton was still on the railing looking through the window, he began yelling more loudly and then observed Goode lift his head up and look the opposite way toward the wall. Norton saw Goode pull his hand out from under the pillow with what Norton believed to be two golf ball-sized crack cocaine rocks.

Norton testified he already had an ambulance standing by for Petty to get him checked out before they released him and Norton "wasn't sure if [Goode] was overdosing on drugs or, you know, what was going on with him inside the room." Norton then went to the motel office

and asked the night manager to bring a key to open Goode's room because he needed to check on the well-being of the individual staying in that room. In the meantime, Schneider continued to knock on Goode's door for an additional five minutes. When Norton returned with the night manager, he knocked more times and still hearing no response, then used the key card to open the door.[2] Because the inside latch was on the door, Norton could only open it five or six inches. Norton announced himself again and told Goode to open the door. Goode got up from bed, came to the door, and asked what was going on. Norton testified Goode appeared "kind of disoriented" in that he stood up with his eyes squinted toward Norton but he was "not really unsteady on his feet." Norton again asked him to open the door. He told Goode that Petty left a cell phone in Goode's room and needed to retrieve it. When Norton asked Goode if he was okay, Goode replied that he was and said he didn't have a cell phone in his room. When Norton again asked if he would open the door, Goode ultimately let them into the room. Although Goode denied knowing Petty, and again denied having Petty's cell phone, Schneider asked if they could search for the cell phone and told Goode they would search in the microwave, bathroom, refrigerator, drawers, and the bed. At this point, Goode agreed. Norton went directly to where he believed the cocaine was placed and retrieved it from under the mattress. They also retrieved from an ashtray a cigar end with what they thought was marijuana. They then placed Goode under arrest and upon searching his person, recovered baggies of marijuana and six hundred seventy-five dollars. Although they saw a cell phone under a blanket on the bed, it belonged to Goode, not Petty. The police never recovered Petty's cell phone.

Goode moved to suppress the evidence recovered in the motel room arguing the police conducted illegal searches of and entry into his room and his consent was not an act of free will. The Commonwealth argued the police did not conduct illegal searches of or entry into his room,

---

[2] The night manager inserted the key card, and Norton pushed the door open.

the community caretaker exception to the warrant requirement allowed the entry and searches, and that in any event, Goode consented. The court denied the motion to suppress. Goode subsequently entered conditional guilty pleas.

## II. ANALYSIS

On appeal, Goode argues the police violated the Fourth Amendment when they peered over the curtains through the top of his motel room window and entered and searched his room without a warrant. He further argues his consent to the entry into and search of his room was not valid.

"Though the ultimate question whether the officers violated the Fourth Amendment triggers *de novo* scrutiny, we defer to the trial court's findings of 'historical fact' and give 'due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" Slayton, 41 Va. App. at 105, 582 S.E.2d at 449 (quoting Barkley, 39 Va. App. at 689-90, 576 S.E.2d at 237-38). Therefore, we give "'deference to the factual findings of the trial court' and 'independently determine' whether those findings satisfy the requirements of the Fourth Amendment." Kyer v. Commonwealth, 45 Va. App. 473, 480, 612 S.E.2d 213, 217 (2005) (quoting Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463, 464 (2003)). To prevail on appeal Goode bears the burden to "show that the trial court's denial of his suppression motion, when the evidence is considered in the light most favorable to the prosecution, was reversible error." Whitfield, 265 Va. at 361, 576 S.E.2d at 464.

We begin by pointing out that a motel guest enjoys the same expectation of privacy in the context of Fourth Amendment rights as the occupant of a home. As this Court has previously stated, "[t]he fourth amendment rights of a guest in a motel room are equivalent to those of the rightful occupants of a house." Servis v. Commonwealth, 6 Va. App. 507, 514, 371 S.E.2d 156, 159 (1988) (citing Stoner v. California, 376 U.S. 483, 490 (1964)). Because Goode was a

- 4 -

registered occupant of the motel room, he was entitled to the same Fourth Amendment protections as those of a rightful occupant of a home.[3]

"[I]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). And although the right to privacy in one's home is certainly a reasonable expectation, we have recognized a homeowner waives that right as to areas a visitor, including a law enforcement officer, could reasonably be expected to cross in approaching the front door and observations that can be made in such areas. Robinson v. Commonwealth, 47 Va. App. 533, 625 S.E.2d 651 (2006), aff'd, 273 Va. 26, 639 S.E.2d 217 (2007). But police must "restrict their conduct to those activities reasonably contemplated by the homeowner." Id. at 546, 625 S.E.2d at 657. Further, uninvited visitors, including the police, are expected to knock on the door, and upon no response, they should then leave. Id. at 549-50, 625 S.E.2d at 659. "Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors." Id. (internal quotation marks and citation omitted). Obviously, a homeowner's expectation of privacy can be reduced as a result of the activities of the home's occupants such as leaving window curtains or blinds open. United States v. York, 895 F.2d 1026, 1029 (5th Cir. 1990); see also Katz v. United States, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). Whether an officer violated a person's reasonable expectation of privacy "cannot be determined by a fixed formula, but must instead be based on the facts and circumstances of each case." Robinson, 47 Va. App. at 549, 625 S.E.2d at 658-59.

---

[3] Norton testified the motel required proof of identification for registration and he obtained from the motel office photocopies of Goode's identification, as he was in fact renting the room.

Under the facts and circumstances of this case, we believe Norton violated Goode's reasonable expectation of privacy. Officer Norton went to the motel room at 2:30 in the morning to assist Petty in retrieving a cell phone at a time when one would expect the occupant to be sleeping. There was no crime alleged, and Officer Norton was not conducting any type of criminal investigation. Indeed, as the Commonwealth points out in its brief, "[n]either Officer Norton nor Officer Schneider went to the defendant's hotel room suspecting a crime had occurred. They were merely helping Petty obtain personal property he had left in two hotel rooms." To help Petty retrieve personal property, Officer Norton knocked on the door repeatedly and announced himself as "Richmond Police" in an increasingly loud voice. This continued for eight to ten minutes by both Norton and Schneider with no response. "After receiving no answer, they should have left, as the purpose of the visit to that property was terminated due to the lack of response from any occupant. Otherwise, the well-established right of citizens to refuse to answer their door would be illusory." Divello v. State, 782 N.E.2d 433, 439 (Ind. Ct. App. 2003). Although there was a gap at the very top of the window above the curtains, the curtains were closed at the bottom clearly indicating an intention to maintain privacy and prevent the motel room from being viewed by visitors walking by the window. Norton, who was over six feet tall, admitted he could not see into the room from the sidewalk where persons would be expected to be. And Goode, having closed his curtains such that persons simply walking by could not see into his room, could not have reasonably contemplated the actions of Norton in getting up on a railing to look into a gap at the top of the window to see if he was in there. Considering the "totality of the circumstances," Robinson, 47 Va. App. at 551, 625 S.E.2d at 659, when Norton stepped up onto the railing and peered over the curtains into Goode's room after repeatedly knocking and announcing himself at 2:30 in the morning merely to assist a

citizen with retrieving personal property, he violated Goode's expectation of privacy in his motel room and conducted an illegal search.

After Norton conducted the illegal search and saw Goode in the room and what he believed to be cocaine, he decided to gain entry at that point. The Commonwealth claims the emergency/community caretaker exception to the warrant requirement permitted the police to search and enter the room.

"'Searches and seizures inside a home without a warrant are presumptively unreasonable. . . . The Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.'" Sharpe v. Commonwealth, 44 Va. App. 448, 455, 605 S.E.2d 346, 349-50 (2004) (quoting Payton, 445 U.S. at 586). As the United States Supreme Court has recognized,

> one exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.

Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (internal quotations and citations omitted) (finding the entrance reasonable since police observed fighting and an injured adult). This Court has also recognized the parallel community caretaking doctrine in which officers may make a warrantless entry to render aid to someone in need or distress. Kyer, 45 Va. App. at 480, 612 S.E.2d at 217. But when an exception is claimed under either doctrine, the claim "must be scrutinized to insure that it is not mere pretext for entries and searches that otherwise fall under the requirement for a warrant." Reynolds v. Commonwealth, 9 Va. App. 430, 438, 388 S.E.2d 659, 664 (1990) (internal quotations and citation omitted).

We disagree that the emergency/community caretaker doctrine provided any basis for the warrantless entry and searches. Officer Norton's stated purpose in going to Goode's motel room was to assist Petty in retrieving his phone, not because he believed anyone was in need or distress. Even according to the Commonwealth, the officers were "in the routine execution of their community caretaking function by assisting Petty, a self-proclaimed relapsed drug addict, in reclaiming his property."

In fact, it was not until Norton climbed upon the railing and peered into the window that he was able to confirm someone was in the room. Although Norton testified he did not know whether Goode might be overdosing or not, there was no evidence in the record to indicate that Goode was overdosing or in any distress at all. Petty never stated that he used drugs in those motel rooms or that anyone in the motel rooms used drugs. Even if a reasonable inference could be made from the Commonwealth's evidence that Petty used drugs in the motel rooms earlier, there was no evidence that Goode had taken drugs in his room, much less that he had taken enough to overdose. And Goode certainly did not seek Officer Norton's assistance before or after he was awakened. There is also no evidence to indicate that Officer Norton intended to render any assistance to Goode.

In any event, once Norton gained entry and spoke to Goode, it was clear Goode needed no assistance. Instead of leaving the room, which he entered uninvited and without a warrant, and having learned Goode was not in distress, he continued his efforts to gain entry and search the room. The police claimed they were gaining entry under the emergency exception to the warrant requirement. But, as soon as they entered the room without a warrant, the police made no apparent attempts to offer any assistance to Goode and told Goode they wanted to search for Petty's cell phone, but then proceeded directly to the suspected location of the cocaine, which they saw only after the illegal search of the room through the window. In the Commonwealth's

own words, to meet the emergency exception, "[t]he vital factor is that . . . the search must be motivated by the police officers' perception of the need to protect and preserve life or property rather than their desire to find evidence of a crime *per se*." It is evident the claim that Goode might have needed assistance was a mere pretext for an entry and searches that otherwise would have fallen under the warrant requirement. See Reynolds, 9 Va. App. at 438, 388 S.E.2d at 664.

The Commonwealth then argues that even if the officers conducted an illegal entry and search, that Goode consented to entry into and subsequent search of his room. A consensual entry or search is "wholly valid." Kyer, 45 Va. App. at 483, 612 S.E.2d at 218. But consent is not valid if it is involuntary or a result of manipulative exploitation by police of an earlier illegal entry or search. Id. The Court must determine if the consent is "sufficiently an act of free will to purge the primary taint." Id.

> "[A] finding with respect to attenuation . . . can only be made after consideration of all the circumstances of the case." United States v. Wellins, 654 F.2d 550, 554 (9th Cir. 1981). This necessarily requires a "careful sifting of the unique facts and circumstances of each case." Schneckloth [v. Bustamonte], 412 U.S. [218], 233 [(1973)]. There being no fixed formula, courts consider the amount of time between the illegal action and the acquisition of the evidence, the presence of intervening circumstances (like consent), and the purpose and flagrancy of the official misconduct. United States v. Seidman, 156 F.3d 542, 548 (4th Cir. 1998).

Id. at 483, 612 S.E.2d at 218-19.

We do not believe Goode's consent was valid under these circumstances. The police conducted an illegal search and made an illegal entry prior to Goode's consent. There was a very brief time between the illegal entry, the consent and the acquisition of the cocaine. See, e.g., Harris v. Commonwealth, 266 Va. 28, 34, 581 S.E.2d 206, 210 (2003) (finding invalid a "consent to search [that] occurred within minutes of the illegal detention"); compare with Kyer, 45 Va. App. at 477-78, 612 S.E.2d at 216 (for ten minutes between being awakened and giving consent, occupant took the time to compose herself in the bedroom while the officers waited in

- 9 -

the living room and then joined the officers in the living room who explained the situation to her before she gave consent).  The "temporal proximity" to the unconstitutional conduct was immediate, and there were no "intervening circumstances" that purge the taint.  Wood v. Commonwealth, 27 Va. App. 21, 30, 497 S.E.2d 484, 488 (1998) (internal quotations and citations omitted).  Under these facts and circumstances, we believe Goode's consent was "manipulative exploitation" of the earlier illegal search and entry and not a "sufficiently free act to purge the primary taint."  See Kyer, 45 Va. App. at 483, 612 S.E.2d at 218-19.

For the foregoing reasons, we conclude the trial court erred in denying Goode's motion to suppress.  Any other conclusion would make the interest an individual may have in retrieving a cell phone from a motel room in which he is not registered at 2:00 a.m. of paramount importance to the rights guaranteed by the Fourth Amendment.  We reverse the judgment of the trial court, vacate Goode's convictions, and remand to the trial court for further proceedings if the Commonwealth be so advised.

Reversed.