COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:  Judges O'Brien, Causey and Frucci


DWAYNE E. DANIELS

                                                         MEMORANDUM OPINION*
v.      Record No. 1072-24-1                                  PER CURIAM
                                                         DECEMBER 9, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Jamilah D. LeCruise, Judge[1]

(J. Barry McCracken, Assistant Public Defender), for appellant.
Appellant submitting on brief.

(Jason S. Miyares, Attorney General; Israel-David J.J. Healy,
Assistant Attorney General, on brief), for appellee.


The trial court convicted Dwayne Daniels of felony possession of a controlled substance

following the denial of his motion to suppress evidence.  Daniels claims he was subjected to an

improper search and seizure and the trial court erred in denying his motion.  Finding no error, we

affirm the trial court.[2]

BACKGROUND

At 10:18 a.m. on a summer morning, while patrolling a residential area, Officer Seth

Williams saw a white car parked on the right side of the road with the driver's door open.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Judge Everett A. Martin, Jr., ruled on the motion to suppress, which is challenged in this appeal; thus, the references to "the judge" refer to Judge Martin, rather than the trial judge.

[2] Having examined the briefs and record in this case, the panel unanimously agrees that oral argument is unnecessary because "the dispositive issue or issues have been authoritatively decided, and the appellant has not argued that the case law should be overturned, extended, modified, or reversed."  *See* Code § 17.1-403(ii)(b); Rule 5A:27(b).

Daniels appeared unconscious in the driver's seat, leaning back towards the front passenger's seat with his legs in the road. Given Daniels's odd position, Williams was concerned that Daniels was suffering from a medical condition and wanted to make sure he was still alive.

Williams parked his police car, started his body worn camera, and walked to Daniels. Williams called out to Daniels more than once to try to wake him. After awakening, Daniels stood but seemed off-balance, so Williams told him that he could sit down.

When Williams asked Daniels who owned the car, Daniels responded "family." Daniels did not have identification and struggled to give his street address coherently. When Williams asked Daniels why he was passed out with his legs in the roadway, Daniels responded that he was tired. Daniels did not respond to Williams's question as to why he was in the car and not in a bed. Daniels denied drinking, using narcotics, or needing medical attention. He did not have identification with him but provided his name, social security number, and date of birth. Daniels answered several questions with his eyes closed while leaning back in the car seat.

To Williams, Daniels had a strange demeanor and seemed "out of it," his answers to questions were odd, and Williams could not understand what Daniels was saying. In Williams's experience, people under the influence did not always have an odor of alcohol about them, particularly if they are high on "fentanyl or something." Daniels looked like he might be impaired, intoxicated, under the influence of drugs, or suffering from a medical emergency. Because Daniels was not acting normally, Williams investigated to determine what was going on and whether Daniels needed help. Williams also wanted to know if he was in danger or if there was criminal activity.

Williams asked Daniels to "do [him] a favor real quick" and step out of the vehicle to stand at the back of the car. Williams told Daniels to stay by his car facing Williams and to keep his hands where Williams could see them, something Williams normally asked when stopping

someone.  Although Daniels then provided the name of the car owner, he could not answer where she lived.  Approximately three and one-half minutes had elapsed from when Williams walked towards Daniels's vehicle until he left Daniels at the back of his vehicle to return to his patrol car.  At that point, Williams considered Daniels to be detained, and he was not free to leave.  Daniels did not appear capable of driving, and Williams wanted him to stay put for the safety of the public, Williams, and himself.  Specifically, Williams did not want Daniels to get hit by a car, and he still didn't know if Daniels was having a medical emergency.

Williams returned to his patrol car to check its computer to verify the owner of the car and Daniels's identity.  He also wanted to know if Daniels might be missing or if there had been calls for him.  From his car, Williams observed Daniels place his hand in his pockets.  Williams left his patrol car, went back to Daniels, and asked him to take his hands out of his pockets.  When Daniels did so, Williams noticed white powder on his skin, including his right hand.  Daniels tried to brush off the powder and said it was "nothing."

Williams suspected the white powder was a controlled substance and that Daniels was trying to undo a bag of it in his pants pocket.  Williams instructed Daniels to put his hands on the car and asked Daniels about the substance.  Williams was concerned for his safety and that the white powder might be fentanyl.  Although he denied possessing narcotics, Daniels never explained the substance.  Daniels then attempted to explain that Williams had found Daniels in this situation because his car was "messed up."  Williams placed Daniels in handcuffs, called for backup, and read him his rights.

Once backup arrived, Williams searched Daniels and found a baggie of suspected illegal narcotics in Daniels's right front pants pocket.  Williams placed the baggie and substance in an envelope and gave it to Detective Broadbent at the Norfolk Police Operations Center.  Subsequent forensic analysis determined that it contained approximately 19 grams of cocaine.

Daniels moved to suppress the evidence, arguing he had been unconstitutionally detained in violation of the Fourth Amendment. The Commonwealth argued at the suppression hearing that Williams's conduct was reasonable under the Fourth Amendment because he was engaged in a "community caretaker" function for the safety of Daniels and the community. The Commonwealth also argued that Williams's conduct met the requirements of a *Terry*[3] stop. The judge noted that if he had been the officer, he "would not have let him get in the car and drive away. [He] would have been concerned about his safety and the public's safety." Daniels disagreed, arguing that Williams's caretaker function ended when he was able to ask questions of Daniels and determine he was okay. Daniels also contended Williams had no reasonable suspicion of criminal activity and had no basis to conduct a criminal investigation or to detain Daniels at the rear of his vehicle to check his information. The judge found that "in the first two minutes and [forty-five] seconds of this encounter, [Daniels] was either asleep, nodding off, or obviously impaired or under the influence of something. He wasn't acting as a normal person would act if a police officer walked up to his car and waited." The judge noted that "I would have detained him longer to figure out if [Daniels] is capable of driving, or do we need to call somebody to drive for him." The judge found that "it was obvious from looking at the [body cam] footage that [Daniels] was not in complete command of his faculties." The judge overruled Daniels's motion to suppress and set a date for trial.

On April 3, 2024, a jury found Daniels guilty of felony possession of a controlled substance. Daniels's appeal followed, challenging the ruling on his motion to suppress.

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1967). Known as a *Terry* stop, an officer who has a reasonable suspicion based on objective facts that "criminal activity may be afoot" may conduct a brief investigatory stop of a person without violating the Fourth Amendment. *Mason v. Commonwealth*, 291 Va. 362, 367 (2016).

ANALYSIS

"In reviewing the denial of a motion to suppress, we 'consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial.'" *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017) (quoting *Malbrough v. Commonwealth*, 275 Va. 163, 168 (2008)). "It is the appellant's burden to show that when viewing the evidence in such a manner, the trial court committed reversible error." *Id.* "In reviewing the denial of a motion to suppress based on the alleged violation of an individual's Fourth Amendment rights, we consider the evidence introduced at both the suppression hearing and the trial." *Bagley v. Commonwealth*, 73 Va. App. 1, 12-13 (2021).

"The question of whether a search or seizure violated the Fourth Amendment is 'a mixed question of law and fact that we review *de novo*' on appeal." *Hairston*, 67 Va. App. at 560 (quoting *Harris v. Commonwealth*, 276 Va. 689, 694 (2008)). We "independently [review] the trial court's application of relevant legal principles such as whether reasonable suspicion or probable cause supported a seizure." *Id.* at 560-61. "In doing so, however, the Court is 'bound by the trial court's factual findings unless those findings are plainly wrong or unsupported by the evidence.'" *Id.* at 561 (quoting *Malbrough*, 275 Va. at 168). "Moreover, 'we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" *Id.* (quoting *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc)).

The Fourth Amendment to the Constitution protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Jones v. Commonwealth*, 71 Va. App. 375, 380 (2019) (alteration in original) (quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011)). Under *Terry v. Ohio*, 392 U.S. 1 (1967), "[i]f a police officer has reasonable, articulable suspicion that a person is engaging in, or is about to engage in, criminal activity, he may detain the person to conduct a

brief investigation without violating the Fourth Amendment's protection against unreasonable searches and seizures." *Atkins v. Commonwealth*, 57 Va. App. 2, 19 (2010). "An officer may briefly detain a person in those circumstances while the officer questions him, tries to identify him and attempts to gather additional information to either dispel or confirm his suspicions." *Branham v. Commonwealth*, 283 Va. 273, 279-80 (2012). "A 'reasonable suspicion' requires only 'some minimal level of objective justification' for making such a stop." *Id.* at 280 (quoting *I.N.S. v. Delgado*, 466 U.S. 210, 217 (1984)). "Whether an officer has a reasonable suspicion to justify such a detention is 'based on an assessment of the totality of the circumstances.'" *Id.* (quoting *Harris*, 276 Va. at 695). "That assessment 'allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."'" *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

We have also recognized the community caretaker doctrine, which allows officers to conduct limited searches or seizures without violating the Fourth Amendment, recognizing that "police owe 'duties to the public, such as rendering aid to individuals in danger of physical harm, reducing the commission of crimes through patrol and other preventive measures, and providing services on an emergency basis.'" *Kyer v. Commonwealth*, 45 Va. App. 473, 480 (2005) (en banc) (quoting *Reynolds v. Commonwealth*, 9 Va. App. 430, 436 (1990)). The community caretaker doctrine is based on the United States Supreme Court's decision in *Cady v. Dombrowski*, 413 U.S. 433 (1973), which held "that police officers who patrol the public highways are often called to discharge noncriminal community caretaking functions, such as responding to disabled vehicles or investigating accidents." *Caniglia v. Strom*, 593 U.S. 194, 196 (2021) (internal quotation marks omitted).

Daniels agrees that Williams's initial approach was consensual and justified as part of a community caretaker function given Daniels's unusual posture in his vehicle. But Daniels argues that at the time he was detained at the rear of the vehicle while Williams checked his information, Williams did not have a reasonable suspicion that Daniels was engaged in criminal activity and did not need additional time to assess Daniels's need for medical assistance. Daniels contends that the drugs recovered from Daniels were a direct result of this unconstitutional seizure, making them inadmissible. The Commonwealth argues that Williams's actions were justified under either the community caretaker exception or based on a reasonable suspicion that Daniels was intoxicated in public.

We agree with the Commonwealth that Williams's brief detention of Daniels at the rear of his vehicle qualifies as a *Terry* stop because Williams had a reasonable suspicion based on objective facts that Daniels was intoxicated in public, a crime under Code § 18.2-388. Thus, we need not decide whether it also was justified under the community caretaker exception.[4]

Prohibited public intoxication includes that caused by "alcohol, narcotic drug, or other intoxicant or drug of whatever nature." Code § 18.2-388. Neither "in public" nor "intoxicated" are further defined in the criminal statute, but we have held that "the plain meaning" of "in public" is "a place in open view, visible to the community." *Crislip v. Commonwealth*, 37 Va. App. 66, 71 (2001). And the Supreme Court has used Code § 4.1-100 to define "'intoxicated' as 'a condition in which a person has drunk enough alcoholic beverages to observably affect his manner, disposition, speech, muscular movement, general appearance or behavior.'" *McGhee v. Commonwealth*, 280 Va. 620, 624 (2010) (quoting Code § 4.1-100).

---

[4] We are obligated "to decide cases on the best and narrowest grounds available." *Theologis v. Weiler*, 76 Va. App. 596, 603 (2023) (quoting *Esposito v. Va. State Police*, 74 Va. App. 130, 134 (2022)).

Here, during the midmorning hours Williams found Daniels apparently unconscious in a car with his door wide open, leaning back towards the passenger's seat with his legs in the road. Daniels was slow to wake up, and Williams had to call out to Daniels more than once. Daniels was off balance when he stood up, and he gave no explanation for why he was in this situation beyond being "tired." Daniels did not have identification, was unable to give his street address in a coherent manner, answered many questions with one-word answers with his eyes closed, and either could or would not answer other questions.

To Williams, Daniels looked like he was impaired, intoxicated, under the influence of drugs, or suffering from a medical condition, and he questioned Daniels about these very things. As the judge observed at the suppression hearing, Daniels "was not in complete control of his faculties." Williams detained Daniels at the rear of his vehicle while he checked his information because he was concerned for Daniel's safety and did not want him to drive away or get hit by a car. And the judge noted that if he had been the officer, he "would not have let him get in the car and drive away. I would have been concerned about his safety and the public's safety." The body worn camera footage supports Williams's suspicion that Daniels was intoxicated and the judge's findings that Daniels was "obviously impaired or under the influence of something." Williams had a reasonable suspicion that Daniels was intoxicated in public, which was objectively justified by the totality of the circumstances. *See, e.g.*, *Clagett v. Commonwealth*, 252 Va. 79, 88 (1996) (holding that the record supported probable cause for arresting a person for public intoxication found "passed out" in the shrubbery of an apartment complex following a citizen complaint); *Fierst v. Commonwealth*, 210 Va. 757, 758, 760 (1970) (holding that probable cause existed for arresting and searching a person for public drunkenness found slumped in a car, fumbling around for his papers and failing to produce his operator's license, mumbling, and needing help out of the car).

Williams's detention of Daniels at the back of the car while he checked his information was brief, limited, and objectively reasonable. Daniels did not have his identification and could not provide an address for the car's owner. Williams needed to verify the information Daniels had given him, and he also wanted to know if Daniels might be missing or if there had been any calls for him. Once Williams checked Daniels's information, he observed Daniels remove his hands from his pockets with white powder on them, giving him a reasonable suspicion that Daniels possessed narcotics. *See Carson v. Commonwealth*, 12 Va. App. 497, 503 (1991) (holding that an experienced officer's observation of white powder on a straw gave an officer probable cause to believe cocaine was concealed in the person's car). Daniels offered no explanation for the white powder on his skin after he removed his hands from his pockets. Only then did Williams place Daniels in handcuffs, read him his rights, and subsequently search Daniels, finding the illegal narcotics in his front right pants pocket. The trial court properly overruled the motion to suppress.

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*