COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Russell and Senior Judge Haley
Argued by videoconference

**PUBLISHED**

ALONZO DEVON WHITE

v.     Record No. 0994-20-4

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE WESLEY G. RUSSELL, JR.
OCTOBER 12, 2021

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
Victoria A.B. Willis, Judge

(Alexander C. Raymond; Raymond Law, PLC, on brief), for
appellant. Appellant submitting on brief.

Maureen E. Mshar, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.

A jury convicted Alonzo Devon White of possession of a Schedule I/II controlled substance.

He challenges the trial court's denial of his motion to suppress the drugs found during a warrantless

search of his apartment. White specifically contends the trial court erred in finding that exigent

circumstances permitted the search. For the reasons that follow, we agree with White, reverse the

judgment of the trial court, vacate White's conviction, and remand the matter for further

proceedings consistent with this opinion if the Commonwealth be so advised.

BACKGROUND[1]

Around 8:20 p.m. on March 25, 2017, police dispatch directed law enforcement to an

apartment complex after receiving an anonymous call reporting that "a black female and a black

---

[1] "In reviewing the denial of a motion to suppress, we 'consider the facts in the light most
favorable to the Commonwealth, the prevailing party at trial.'" Aponte v. Commonwealth, 68
Va. App. 146, 156 (2017) (quoting Hairston v. Commonwealth, 67 Va. App. 552, 560 (2017)).

male had an altercation in the parking lot in which the black male pulled a gun on the black female." Further reports indicated that "a black male had beat a female in the street with a gun."

Deputy K.J. Simpson and Sergeant Christian Mireles of the Stafford County Sheriff's Department responded to the call and arrived at the scene five and fifteen minutes later, respectively. Multiple other units also arrived in response to the call. Two "large gatherings" and numerous other scattered bystanders were present when they arrived. Simpson "didn't see the two people that were described initially where they were supposed to be," so he began speaking with the potential witnesses.

Some reported to Simpson "that a black male and a black female had gotten in a physical altercation and the black male had pulled a gun on the black female and struck her with the gun and then ran back . . . into an apartment." Others indicated the woman had initiated the fight and hit the man and the man then "took out a gun and hit her with it." Other reports indicated that the man "just pointed" the gun at her head. They further stated, "we are not going to get involved with this, we are not going to testify." Those who spoke with Mireles provided "very similar stories of a female having been beaten by a black male with a gun and that he had stomped on her head and then fled into" apartment 302.

Based on what was learned in the parking lot, Simpson and two other deputies proceeded to the third floor of the apartment building, which was "one big building with three stories high, with four apartments on each floor." A resident of the third floor "came out and stated the individuals we were looking for were in apartment 302." The officers received no information to suggest that anyone other than the man and woman sought were in the apartment.

Simpson knocked on the door to apartment 302 in a "normal" manner. When no one answered, he knocked again a little bit louder. When no response was forthcoming, Simpson knocked yet again, this time "banging" loud "enough that somebody on the first floor would have

heard" him. When no one answered the door, Simpson knocked yet again, striking the door even harder and with sufficient force that the door "was physically shaking[.]"

After the fourth attempt, a woman matching the general description of the woman being sought answered the door. She opened the door only "a very small ways, . . . approximately ten inches or so." She was carrying a child and had a "split lip" that was swollen but not bleeding. Simpson identified himself and asked her whether "an altercation had occurred." The woman initially denied any altercation, but when Simpson confronted her with witness statements, she indicated that there had been a verbal argument only.

Simpson asked her if he could come inside to speak to her about it, but she said no and "slid out of the apartment . . . in such a manner that would not allow me . . . or allow anyone else to look into the apartment[.]" The woman then immediately shut the door behind her. "Still believing that there's a possibility of someone with a gun inside the residence," Simpson escorted everyone downstairs for their safety. Simpson returned to the second floor "in case the individual with the gun came back outside the apartment complex, [to be] between that person and innocent bystanders downstairs." From there, he could hear "bits and pieces" of the woman's conversation with the officers below, who were asking about the occupants of the apartment; she was "very vague and not cooperative."

Lieutenant Deuntay Diggs also responded to the call and arrived at 8:39 p.m. He stated that "twelve to fifteen deputies" were on the scene. He set up a perimeter, positioning some deputies near the windows at the rear of apartment 302. Other officers on scene relayed to him what they had ascertained regarding the status of the situation, including the witness accounts. They also informed him that the woman was not cooperating, being evasive, and refusing to identify the man or to tell whether he was inside the apartment.

Diggs then questioned the woman "to figure out what was going on and where the male party was located[.]" He inquired as to "what happened once they got into the apartment." Diggs testified that he was concerned that "something else transpired" in the apartment, fearing that she may have "hurt him in some way because of what happened downstairs." The woman falsely identified the man, ultimately discovered to be White, as Aaron Jones.

Diggs decided that officers would enter the apartment, but he wanted to wait until they could obtain a ballistic shield for officer safety. The shield was with another unit located approximately six miles away, and it was en route as of 8:57 p.m. No attempt to obtain a search warrant was made prior to Diggs' decision that officers would enter the apartment or their eventual entry.

Once the shield was procured, Diggs, Simpson, and Mireles returned to apartment 302. The door was closed. The officers "bang[ed], announce[d], [and] waited probably 30, 45 seconds with no reply." They "yell[ed] out the name that the female provided . . . ." Finding the door unlocked, one of the officers opened the door and the officers stopped at the threshold to announce themselves again. The officers ordered anyone in the residence to come out and identify themselves, but there was no response. After waiting "another 30, 45 seconds" with no reply, they then, around 9:11 p.m., stepped into the apartment, announced themselves again, and repeated their demand that anyone else in the apartment make themselves known. Another thirty or forty-five seconds later White replied, "I'm coming out" and appeared from the back bedroom. He matched the description of the man in the initial report about the altercation in the parking lot. Because White potentially maintained possession of a gun, he was ordered to show his hands and to lay on the ground; he complied and was taken into custody.

After White was detained at 9:13 p.m., Diggs and Simpson conducted a protective sweep of the apartment to ensure there were no other occupants. They observed drug paraphernalia in plain view, including a grinder, a digital scale, two-inch straws, razor blades, and some plastic baggies.

- 4 -

White powder was visible on the straws. Based on these observations, officers decided to seek a search warrant. The officers did not leave the scene to obtain the warrant. Rather, they called in the information necessary to obtain the search warrant, and the warrant was issued.

The warrant thus obtained, a thorough search of the apartment ensued. Officers found a gun and other items that had not been in plain view, including a bag containing a powdery substance, empty plastic baggies, and another digital scale in a safe. Laboratory testing revealed that the white powder on the straws was cocaine and that the powdery substance recovered from the safe was heroin. Based on what the search uncovered, White was charged with possession of a Schedule I or II controlled substance, possession of a firearm after having been convicted of a violent felony, and possession of a firearm while possessing a Schedule I or II controlled substance.

White filed a motion to suppress the evidence discovered after the officers entered the apartment, arguing it was recovered in violation of the Fourth Amendment. Although he conceded that there was probable cause to believe he had been engaged in the altercation in the parking lot and was in the apartment, White argued that officers were required to obtain a search warrant before entering the apartment. Specifically, he contended that "[e]xigent circumstances simply were not present in this case[,]" and thus, officers were required to obtain a warrant before entering the apartment. In response, the Commonwealth argued that exigent circumstances justified the warrantless entry, but conceded that, if the entry violated the Fourth Amendment, the evidence discovered after entry, including that which was discovered after officers obtained the search warrant, should be suppressed as "fruit of the poisonous tree." Thus, the sole issue at the suppression hearing was whether exigent circumstances justified the officers' warrantless entry into the apartment.

Simpson, Mireles, and Diggs testified at the suppression hearing. In explaining the decision to enter the apartment without first seeking a warrant, the officers gave multiple reasons. Each of

them noted that domestic violence situations, which is what they had been called to investigate, raise an officer's level of concern. The officers described such situations as often "emotional" and "volatile."

The officers conceded that they had removed the woman believed to have been involved in the initial domestic incident and who some witnesses had identified as the instigator of the incident from the apartment. From their timeline, she had been out of the apartment for more than thirty minutes before officers entered the apartment. The officers noted that it was possible that others could have been present in the apartment with White; however, they had received no information to suggest that anyone else was in the apartment.

Diggs noted that it was possible that the woman had injured White in the apartment, and he therefore had concerns about White's safety. None of the officers had received any information to that effect or had heard any cries for help or other signs of distress from inside the apartment.

The officers also noted that the report that White had been seen with a gun in the parking lot raised their level of concern. They noted that it posed a potential danger to the officers as well as others in the apartment complex. There had been no reports that gunshots had been fired that night, and there were no reports regarding White using the gun in a threatening manner other than the conflicting reports about his alleged use of it during the initial altercation that had occurred approximately forty-five minutes prior to the officers' entry into the apartment. Simpson conceded that officers had no information at that time to suggest that White was not lawfully permitted to possess a firearm.

In addition to safety concerns the officers expressed related to the gun, officers expressed concern that White might attempt to dispose of the gun, which potentially was evidence in the domestic dispute that officers were there to investigate. They expressed concerns that, if they did not enter the apartment quickly, it could be hidden, thrown out of a window of the apartment, or

destroyed. The officers conceded that the only way for White to get the gun out of the apartment was through either the front door or the apartment's rear windows and that multiple deputies were stationed at those locations prior to the officers' entry into the apartment. Regarding the stated concern that the firearm might be destroyed if they waited for a warrant, Mireles, when asked how White could have destroyed the gun, responded "I don't know, I've never destroyed a firearm" and conceded that he did not "have the same concerns about firearms as . . . with drugs or other small things" as he "would assume you can't flush a firearm down the toilet[.]"

After hearing the evidence and the parties' arguments, the trial court issued its ruling from the bench, noting that "we look at the circumstances as they appear to the officer on the scene" and "don't require the police to have a crystal ball[.]" The trial court noted that officers were aware of "some type of altercation . . . between a man and a woman . . . in which the male had a gun." The trial court emphasized "the presence of a gun," noting that firearms "give rise to serious concerns[, n]ot only about the safety of the two parties involved . . . , but everybody who lives in that apartment complex[.]"

The trial court also referenced that the officers had to knock multiple times before getting a response when they first approached the apartment and that "the door is answered by somebody who . . . won't let them in, comes out, is evasive, [and] . . . is also providing false information[.]"

The trial court then reviewed the non-exhaustive list of ten considerations for determining whether exigent circumstances exist that the Supreme Court set out in Verez v. Commonwealth, 230 Va. 405 (1985). After determining that multiple Verez factors were present, the trial court concluded where there are "five of the key factors of a list of ten where the [c]ourts are describing exigent circumstances, I think you have exigent circumstances." As a result, the trial court denied White's motion to suppress.

White was then tried and convicted by a jury of possession of a Schedule I or II controlled substance.[2] This appeal follows, in which White contends "the trial court erred by denying [his] motion to suppress evidence obtained from a warrantless search as the search was not based on exigent circumstances."

## ANALYSIS

### I. Standard of review

As an appellant "challenging the trial court's denial of his motion to suppress, [White] 'bears the burden of establishing that reversible error occurred.'" Saal v. Commonwealth, 72 Va. App. 413, 421 (2020) (quoting Mason v. Commonwealth, 291 Va. 362, 367 (2016)). White's "claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact . . . ." Merid v. Commonwealth, 72 Va. App. 104, 108-09 (2020) (quoting King v. Commonwealth, 49 Va. App. 717, 721 (2007)), aff'd, __ Va. __ (2021). Accordingly, we are "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them." Knight v. Commonwealth, 61 Va. App. 297, 305 (2012) (quoting McGee v. Commonwealth, 25 Va. App. 193, 198 (1997) (*en banc*)). In addition, we "give 'due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" Kyer v. Commonwealth, 45 Va. App. 473, 479 (2005) (*en banc*) (quoting Slayton v. Commonwealth, 41 Va. App. 101, 105 (2003)). Nevertheless, we "review[] *de novo* the overarching question of whether a search or seizure violated the Fourth Amendment." Moreno v. Commonwealth, 73 Va. App. 267, 274 (2021) (quoting Williams v. Commonwealth, 71 Va. App. 462, 475 (2020)).

### II. The Fourth Amendment and the warrant requirement

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

___

[2] The jury acquitted White of the two firearm charges.

"[B]y its express terms, it protects not only the individual, but also his or her things, and, most pertinent here, his or her home from unreasonable searches." Saal, 72 Va. App. at 421.

"Among the many interests served by the Fourth Amendment, the privacy interest in one's home has few equals." Kyer, 45 Va. App. at 480. Indeed, as the United States Supreme Court has recognized, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed[,]" Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (quoting United States v. U.S. District Court, 407 U.S. 297, 313 (1972)), because "[a]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion[,]" Kyer, 45 Va. App. at 480 (quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)).

Because the protections afforded by the Fourth Amendment are at their apex when a person is in his home behind a closed door, "searches . . . inside a home without a warrant are presumptively unreasonable[,]" Payton v. New York, 445 U.S. 573, 586 (1980), and thus, "are presumptively invalid[,]" Merid, 72 Va. App. at 112 (quoting Cantrell v. Commonwealth, 65 Va. App. 53, 59 (2015)). Nevertheless, these "'presumption[s] may be overcome in some circumstances' because the 'warrant requirement is subject to certain reasonable exceptions.'" Id. (quoting Ross v. Commonwealth, 61 Va. App. 752, 759 (2013)). Thus, "warrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement." Kentucky v. King, 563 U.S. 452, 462 (2011).

### III.  The exigent circumstances exception

"One well-recognized exception applies when 'the exigencies of the situation' make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." Ross, 61 Va. App. at 759 (quoting Washington v. Commonwealth, 60 Va. App. 427, 436 (2012)). "Such exigencies often arise . . . where the police have probable cause

to enter or search a location or thing, but exigent circumstances excuse the need to obtain a warrant . . . ." Id. at 760. Accordingly, "the exigent circumstances exception allows a warrantless search when an emergency leaves police insufficient time to seek a warrant." Birchfield v. North Dakota, 136 S. Ct. 2160, 2173 (2016).

Because warrantless searches of the home are presumptively unreasonable, "the burden rests with the government to prove . . . exigent circumstances." Commonwealth v. Campbell, 294 Va. 486, 495 (2017). "To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, [a c]ourt looks to the totality of circumstances[,]" Missouri v. McNeely, 569 U.S. 141, 149 (2013), examining those "circumstances as they reasonably appeared to the law enforcement officers on the scene[,]" Verez, 230 Va. at 411. Indeed, "whether exigent circumstances exist to justify a warrantless search is not based on a retrospective analysis of the circumstances; rather, the inquiry is focused on review of the 'circumstances as they reasonably appeared to trained law enforcement officers to exist when the decision to [search] was made.'" Moreno, 73 Va. App. at 276 (alteration in original) (quoting Robinson v. Commonwealth, 273 Va. 26, 41 (2007)).

Although questions of burden and how to view the circumstances in determining the existence of exigent circumstances are definite and well defined, what constitutes exigent circumstances is not. As the Supreme Court has observed, "[n]o fixed legal definition fully captures the meaning of exigent circumstances." Evans v. Commonwealth, 290 Va. 277, 283 (2015). Indeed, "[n]o court could provide an exhaustive enumeration of factors that would distinguish circumstances that qualify as exigent from those that would not." Id.

Despite this inherent difficulty, the Supreme Court in Verez provided a non-exhaustive list of considerations to inform a reviewing court's analysis of whether exigent circumstances are present. Specifically, a reviewing court should consider

(1) the degree of urgency involved and the time required to get a warrant; (2) the officers' reasonable belief that contraband is about to be removed or destroyed; (3) the possibility of danger to others, including police officers left to guard the site; (4) information that the possessors of the contraband are aware that the police may be on their trail; (5) whether the offense is serious, or involves violence; (6) whether officers reasonably believe the suspects are armed; (7) whether there is, at the time of entry, a clear showing of probable cause; (8) whether the officers have strong reason to believe the suspects are actually present in the premises; (9) the likelihood of escape if the suspects are not swiftly apprehended; and (10) the suspects' recent entry into the premises after hot pursuit.

Verez, 230 Va. at 410-11.

Although reviewing courts, including this one, are well advised to view questions of exigency through the lens of the ten Verez considerations, such efforts come with substantial caveats. The Verez considerations are not a checklist to be applied mechanically with some raw number of factors resulting in a finding of exigency. Furthermore, the considerations should not be viewed in binary terms, either "yes" a factor is present or "no" it is not. Properly viewed, each of the considerations, much like the overarching question of exigency itself, represents a continuum or a sliding scale with some circumstances warranting more concern than others even if a factor is nominally present in both instances. Additionally, the list is not exhaustive, and the exigency analysis requires a review of "the totality of circumstances." McNeely, 569 U.S. at 149.

Finally, as the trial court correctly noted, the exigency inquiry does not "require the police to have a crystal ball[,]" and the officers' conclusion that exigency required entry without a warrant did not require anything approaching certainty. Washington, 60 Va. App. at 438 (noting that, consistent with the Fourth Amendment, officers "are not required to possess either the gift of prophecy or the infallible wisdom that comes with hindsight" (quoting Hill v. Commonwealth, 18 Va. App. 1, 3 (1994))). However, a finding of exigency must arise from the evidence/information possessed by the officers and not mere speculation based on what may be theoretically possible. Behind every closed door exists the theoretical possibility of an exigent

- 11 -

circumstance, from an injured victim who requires medical attention to a trove of drugs or other contraband that could be destroyed. Thus, to find that such speculation could establish exigency effectively would, for the most part, read the warrant requirement out of the Fourth Amendment. Accordingly, a finding of exigency must be tied to actual information about present circumstances and not mere theorizing.

IV.  Application to the instant case

With these caveats in mind, we address the trial court's application of the Verez considerations to the instant case.

A.  Degree of urgency involved and the time required to get a warrant

In addressing the degree of urgency the situation posed, the trial court found that the officers faced an urgent situation because of the nature of the offense and the time it might have taken to get a warrant. The trial court stated "we wait around and drive around and try to get warrants and, you know, the assumption that you can get to the magistrate's office and get a warrant and come right back means there's nobody else at the magistrate's office, there's no tie-up, there's no delay. So we don't know that." Neither the trial court's conclusion nor its stated reason finds sufficient support in the record.

Properly understood, the urgency inquiry is focused on whether there is an emergency situation, such as continuing criminal activity, a person requiring medical care, or the destruction of evidence, that likely will worsen if the officers take the time necessary to get a warrant. To the extent it appears that there is no imminent change to the circumstances about to occur and that the status quo largely can be maintained while the officers seek a warrant, the situation is not "urgent" for the purposes of an exigency analysis.

Here, the officers were investigating a domestic altercation that had occurred in the parking lot. Based on the information received, the domestic assault had been completed in the parking lot

and was not ongoing as officers received no information that either the man or the woman had forced the other back into the apartment. To the extent the altercation, and hence the crime, may have continued behind the closed apartment door, such possibility ceased shortly after the officers arrived on scene and escorted one of the two participants, who some witnesses had identified as the instigator, from the apartment. Thus, the crime the officers were investigating had been completed and was not ongoing when they entered the apartment, lessening the urgency of the situation.

Furthermore, despite their decision not to seek a warrant prior to entry, the officers' conduct belies a sense of urgency. Based on their testimony, approximately forty-five minutes elapsed between their first approach of the apartment and their ultimate entry. Although they speculated as to things potentially occurring behind the door, none of their theories caused them to act immediately, suggesting the officers themselves thought that no true exigency was sufficiently likely.[3] While standing guard outside of the door, the officers received no information suggesting any change in the status quo, let alone a change that increased the level of urgency. No cries for help, suspicious sounds, threats, or gunshots emanated from the apartment. From the time the officers arrived through their entry and seizure of White, the gun was not even seen, let alone brandished or used in a threatening manner. In fact, with the removal of the woman from the apartment and the passage of time from the initial parking lot altercation potentially allowing the combatants to "cool off," the situation was less urgent when the officers entered without a warrant than when they first arrived.

---

[3] For example, if entry had been motivated by a belief that White was injured and could be bleeding to death, waiting nearly forty-five minutes to enter would not have addressed the theoretical emergency.

The officers' decision to delay entry for about forty-five minutes takes on additional salience when viewed against the time and effort that would have been necessary to get a warrant.[4] Apparently focusing on testimony that the apartment was fifteen minutes away from the magistrate's office, meaning driving to and from the magistrate's office would have required thirty minutes, and theorizing about potential additional time spent before the magistrate or waiting in line at the magistrate's office, the trial court effectively concluded that a warrant could not have been obtained quickly. As noted above, the record refutes that conclusion.

The record makes clear that the estimated thirty-minute drive time to and from the magistrate's office is immaterial because, when officers on the scene finally decided to seek a search warrant after their warrantless entry, they obtained one *without* driving to and from the magistrate's office. Specifically, Simpson testified that the officers did not leave the location to obtain the warrant, but rather, "called" to obtain the search warrant. That a warrant could be (and, in fact, was) obtained through telecommunication rather than a responding officer's physical appearance before a magistrate is significant. Removing travel time from the calculus greatly reduces the potential need to act without a warrant. McNeely, 569 U.S. at 155 (recognizing that "technological developments that enable police officers to secure warrants more quickly . . . are relevant to an assessment of exigency"). From this record, it appears that, if officers had sought the warrant when they approached the apartment the first time, they may very well have had it when they entered forty-five minutes later, strongly suggesting that taking the step of obtaining a warrant would not have impeded the officers' eventual conduct in any meaningful way.

---

[4] We do not criticize the officers' decision to wait until the arrival of the ballistic shield prior to entering the apartment. The officers reasonably could conclude that such a step was prudent and should be taken. However, it delayed entry into the apartment, which undermines the claim of exigency. Given the length of the delay, the officers very well may have been able to obtain a warrant while awaiting the arrival of the ballistic shield.

- 14 -

B.  Officers' reasonable belief that contraband is about to be removed or destroyed

It is clear that, prior to entering the apartment, officers had no reasonable belief that contraband was about to be removed or destroyed.  The officers had no knowledge or information at the time of entry even to suggest that contraband was present.  The drugs that eventually were discovered on the other side of the closed door were unknown to the officers and were not part of the officers' investigation prior to entry.  That drugs eventually were discovered is irrelevant because whether sufficient exigency exists to render a warrantless search reasonable under the Fourth Amendment is based on the information available to the officers at the time of entry and cannot be supported by facts learned afterwards.  Moreno, 73 Va. App. at 276.

The only object that fairly could be considered part of the officers' investigation at the time of entry was the gun that White reportedly had displayed or used during the parking lot altercation.  The gun, however, could not be classified as "contraband" at the time of entry because, as Simpson conceded, the officers had no information at the time of entry to suggest that White could not possess a gun.[5]  Furthermore, although officers speculated about the theoretical possibility that the gun could be disposed of by being thrown out of a window or somehow destroyed, the remainder of their testimony reduced such theoretical possibilities to near impossibilities.  After all, multiple officers were stationed at every point of ingress and egress from the apartment, and thus, it was highly unlikely that White could have disposed of the gun by throwing it from the apartment.  Furthermore, despite suggesting that the gun might somehow be destroyed, the officers themselves failed to suggest even a theoretical mechanism by which that could have been accomplished with Mireles admitting that officers do not "have the same concerns about firearms [being destroyed] as . . . with drugs or other small things" as they "assume you can't flush a firearm down the toilet[.]"

---

[5] Once again, the fact that officers eventually would learn that White was not permitted to possess a firearm because of a prior felony conviction cannot be used to justify entry because they did not know that at the time they entered the apartment.

Thus, based on all of the facts and circumstances, the officers had no reason to believe that any evidence they were seeking, let alone contraband, would have been disposed of if they had taken the steps necessary to obtain a warrant prior to entering the apartment.

## C. Possibility of danger to others

The trial court reasonably concluded that the information available to the officers raised a reasonable concern that White posed a potential danger to others, including the officers themselves. He had been involved in a domestic altercation, had displayed a firearm, and had possibly used that firearm as a bludgeon. This provided a basis for being concerned about the safety of the woman, the officers, and people in the adjacent apartments.

If the analysis were binary, it would end with that conclusion; however, as noted above, it is not. Although there were reasons to be concerned for the safety of others, the possibility of such harm diminished over the time that the police were on the scene. First and foremost, the woman believed to be a participant in, if not the instigator of, the incident in the parking lot was removed from the apartment, largely assuring her safety. Furthermore, although the gun was seen and potentially used as a bludgeon before police arrived, there was no information after the arrival of police to suggest its imminent use. White never threatened anyone with the gun once police arrived, and no gunshots were fired at any point. No information learned by the police in their forty-five minutes on scene prior to the warrantless entry suggested that anyone was in imminent danger. Thus, although a gun is a potential danger and the trial court was correct to consider the potential danger to others as a possibility, the other facts available weaken, but do not eliminate, the case for exigency based upon potential danger to others.

## D. Information that the possessors of the contraband are aware that police may be on their trail

White knew police were at his door. Given the circumstances, it is reasonable to conclude that he knew he was being sought regarding the parking lot altercation. It is less reasonable to

conclude that he believed officers were aware that there was contraband in the apartment. As noted above, the officers had no such knowledge, because, based on the information available, they did not suspect that White possessed contraband.

### E. Seriousness of offense/level of violence

The crime the officers were investigating, a domestic altercation combined with the presence of a firearm, is a serious offense. Although in the continuum of offenses it is not as serious as rape or murder, the officers testified to the volatility of such situations and the real possibility that such incidents can escalate to more serious offenses. Here, however, that possibility had been greatly reduced before the officers entered the apartment because the woman, who as part of the domestic altercation was a necessary component for a revival or escalation of the initial event, had been removed from the apartment. Thus, while the crime being investigated was serious and involved some violence, the fact that the woman had been separated from White and time had passed since the incident lessened the possibility of escalation.

### F. Officers' belief that the suspect is armed

There was ample reason for the officers to believe that White may be armed. They had been called to the scene to investigate an apparent domestic dispute in the apartment's parking lot, and multiple witnesses informed them that White either displayed or used a gun as a bludgeon during that altercation. Although it was possible that the gun was no longer on White's person when officers entered the apartment, it was reasonable for them to conclude it likely was.

### G. Clear showing of probable cause at the time of entry

As White conceded in the trial court, officers possessed probable cause when they entered the apartment. They had the initial dispatch report and witness statements indicating that White had been involved in the parking lot altercation, had displayed a firearm during the altercation, may have used the firearm as a bludgeon during the altercation, and had retreated into the apartment

before the police arrived. Eventually these statements were partially confirmed by the woman, who, despite initial denials and providing a false name for White, confirmed that White was in the apartment. Taken together, the information available to the officers more than amply provided probable cause to believe that White had engaged in criminal activity and that he, along with evidence related to the potential activity (the gun), could be found in the apartment.

### H. Officers' reason to believe the suspect is present in the premises

The officers here had substantial reason to believe their suspect, who turned out to be White, was present in the apartment. Disinterested witnesses placed him there, and the woman eventually conceded he was there. Given that no one had been seen exiting the apartment in the interim and all of the points of ingress and egress were being watched by officers, the officers had more than a sufficient basis for concluding that White was in the apartment at the time of entry.

### I. Likelihood of escape if the suspect is not swiftly apprehended

There barely was even a theoretical possibility, let alone a likelihood, that White could escape if the officers had taken the time to get a warrant. As noted above, it would not have taken long for the officers to have obtained a warrant, and the warrant could have been obtained without the officers leaving the scene. Furthermore, twelve to fifteen officers had formed a perimeter around the apartment. Officers conceded that the windows and the front door were the only means of ingress and egress from the third-floor apartment, and multiple officers had those points guarded. There was no realistic possibility of White's escape if the officers had taken the steps to obtain a warrant prior to entering the apartment.

### J. Suspect's recent entry into the premises after hot pursuit

When officers first arrived on the scene they learned that White recently had entered the apartment. Accepting that as true means that White was already in the apartment when the police arrived, meaning that his entry was not the result of police pursuit, "hot" or otherwise.

- 18 -

K.  Other factors

Another factor stressed by the Commonwealth and referenced by the trial court was the fact that Simpson had to knock on the door on multiple occasions and with increasing force before getting a response despite the fact that both the woman and White were in the apartment.  Implicit in these references is the idea that the failure of people to answer the door when the police knock is suggestive of criminality, exigency, or urgency.  Although there may be situations where specific facts support such an inference, in the abstract, and under the facts present here, no such inference is warranted.

One of the interests the Fourth Amendment protects is the right of a person to retreat into his home and ignore knocks on the door, even when the person knocking is a law enforcement officer.  As the United States Supreme Court noted in King,

> [w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do.  And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak.

563 U.S. at 469-70.  Thus, absent other facts, such as sounds emanating from the dwelling indicating criminality, urgency, or exigency, the decision of a dwelling's occupants to stand on their constitutional prerogatives to refuse to answer the door or to refuse to allow police to enter once they have answered the door does not provide a basis for concluding exigent circumstances exist.  Id. at 470.  Because no such additional facts were present here, White and the woman's decision not to answer the door initially and the decision not to allow the officers inside provides no basis for a finding of exigency in this case.

L.  Totality of the circumstances

If the Verez considerations were viewed properly as a binary checklist, the trial court correctly concluded that at least half of the listed factors were present to one degree or another.

However, as noted above, the Verez considerations are not to be viewed in such a mechanistic fashion. Rather, they provide a context for deciding whether exigency exists, and the nominal presence of a majority of the factors does not compel a conclusion that sufficient exigency exists to authorize a warrantless search of a home.

This is especially true when, as here, one fact that independently does not create exigent circumstances serves as the basis for concluding that multiple, overlapping Verez considerations are present. Central to the trial court's conclusion that a majority of the Verez considerations were present was the report that White displayed and/or used a firearm as a bludgeon in the initial encounter and presumably still had easy access to that firearm while behind the closed door of the apartment. The firearm can be directly tied to much of the trial court's analysis of the Verez considerations, e.g., degree of urgency, potential of danger to others, seriousness of the offense, level of violence, whether the suspect is armed, etc.

Although pertinent to the analysis, the presence of a firearm, standing alone, is insufficient to establish exigent circumstances. See, e.g., Harris v. O'Hare, 770 F.3d 224, 236 (2d Cir. 2014), as amended (Nov. 24, 2014) ("[M]ere suspicion or probable cause for belief of the presence of a firearm does not, on its own, *create* urgency."); United States v. Johnson, 22 F.3d 674, 680 (6th Cir. 1994) ("The mere presence of firearms does not create exigent circumstances."); United States v. Gooch, 6 F.3d 673, 680 (9th Cir. 1993) ("The presence of a firearm alone is not an exigent circumstance."). There is no firearm exception to the Fourth Amendment; the warrant requirement applies even when officers are investigating crimes involving the display or use of a firearm. Here,

there was no indication that the firearm, which had been displayed in an altercation forty-five minutes earlier, presented an immediate and active danger.[6]

Whether a firearm is present or not, the ultimate question in determining if exigent circumstances exist is whether the totality of the circumstances combine to support a conclusion that "there is a compelling need for *immediate* official action and a risk that any delay will present a substantial threat of *imminent* danger to life or public safety." Ramey v. Commonwealth, 35 Va. App. 624, 633 (2001) (emphasis added). Nothing that the officers observed or learned during the forty-five minutes on scene suggested that an "imminent danger to life or public safety" existed. Id. Furthermore, by waiting forty-five minutes before entering the apartment, the officers' conduct also suggests that there was not "a compelling need for immediate official action" because no such immediate action was taken. Id. Finally, the forty-five-minute delay, coupled with the ability of the officers to obtain a warrant relatively quickly without leaving the scene, established that the time necessary to obtain a warrant was not a significant impediment to the actions the officers wished to take and ultimately took. As a result, the trial court erred in finding that exigent circumstances justified the officers' warrantless entry into the apartment.[7]

## V. Further proceedings

As the Commonwealth conceded in the trial court, a finding that the officers' warrantless entry into the apartment was not justified by exigent circumstances compels the conclusion that

---

[6] A firearm always has the potential to be used in a dangerous manner. However, to provide the basis for exigency, there must be some information suggesting that such use is immediate and more than theoretical. Here, no shots had been fired that evening, the other participant in the altercation had been separated by both time and space from White, and White made no threats to anyone, verbal or otherwise, after officers arrived on the scene.

[7] We note that, much as the Verez considerations cannot be applied mechanically, neither can the analysis undergirding our opinion here. Ultimately, questions of exigency will depend on the particular facts of the specific case with small changes in those facts greatly affecting the analysis.

White's motion to suppress was well founded and that all of the evidence discovered in the apartment should be suppressed as "fruit of the poisonous tree." <u>See generally</u> <u>Commonwealth v. Ealy</u>, 12 Va. App. 744, 754 (1991). Although there are doctrines that permit evidence discovered in an illegal search to remain admissible, <u>see</u> <u>Carlson v. Commonwealth</u>, 69 Va. App. 749, 759 (2019), none are applicable here. Accordingly, we reverse the trial court's denial of White's motion to suppress and order that the evidence discovered in the apartment be suppressed for any and all further proceedings in this matter.

CONCLUSION

For the foregoing reasons, we reverse the judgment of the trial court, vacate White's conviction, and remand the matter for further proceedings consistent with this opinion if the Commonwealth be so advised.

<u>Reversed, vacated and remanded.</u>