COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, AtLee and Malveaux
Argued by videoconference

**PUBLISHED**

BRANDON ALAN McCARTHY

v.      Record No. 1225-20-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE GLEN A. HUFF
NOVEMBER 9, 2021

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Marjorie T. Arrington, Judge[1]

Erik A. Mussoni, Assistant Public Defender, for appellant.

Leanna C. Minix, Assistant Attorney General (Mark R. Herring,
Attorney General, on briefs), for appellee.


Brandon Alan McCarthy ("appellant") was convicted in the Chesapeake Circuit Court

(the "trial court") for possessing heroin in violation of Code § 18.2-250. On appeal, he contends

the evidence the Commonwealth used to support that conviction was obtained in violation of his

Fourth Amendment rights. In the alternative, he asserts that amendments to Code § 18.2-251.03

protected him from prosecution and should have been applied retroactively by the trial court.

This Court disagrees on both counts and affirms appellant's conviction.

I. BACKGROUND

On appeal, "this Court consider[s] the evidence and all reasonable inferences flowing

from that evidence in the light most favorable to the Commonwealth, the prevailing party at

trial." Williams v. Commonwealth, 49 Va. App. 439, 442 (2007) (*en banc*) (quoting Jackson v.

---

[1] While the final orders in this case were signed by Judge Arrington, Judge Randall D.
Smith presided over the suppression hearing.

Commonwealth, 267 Va. 666, 672 (2004)). Viewed through this lens, the evidence shows the following:

In the mid-afternoon of April 1, 2019, Officer E. Cutburth was dispatched to Room 216 of the Studios and Suites for Less motel complex in response to an anonymous caller claiming they saw an unresponsive male lying on the floor of that room. When Cutburth arrived at the scene, she saw that the door was "slightly ajar." She then pushed the door open and announced her presence as a member of Chesapeake law enforcement. Upon doing so, she noticed that the room had two beds on its left side with a nightstand in between them. She further noticed "a foot protruding" between the bed on the far side of the room and the wall. She then approached the individual and identified him as appellant.

Appellant was unconscious, pale, cool, sweating "profusely," and engaged in what Cutburth described as "agonal breathing." Given appellant's condition and because she had dealt with "probably around 100" overdose cases, Cutburth believed appellant was, in fact, suffering from a drug overdose. Cutburth attempted to elicit a response from appellant by giving him a "sternum rub," but that measure proved unsuccessful.

Shortly after, Officer J. Mattacchione and emergency medics arrived at the scene. Cutburth let the medics take over appellant's treatment and proceeded to search the motel room with Mattacchione for evidence of drug use.

The officers first surveyed what was in plain view in the motel room by perusing the outer portions of appellant's clothing, the top of the bed at the far end of the room,[2] the top of the nightstand, and the top of a dresser on the right side of the motel room. That search provided no

---

[2] When surveying the top of the bed, Cutburth also opened and looked through several handbags that were on the bed. Appellant does not challenge that aspect of the search, but instead narrows his focus on Mattacchione's subsequent search of the nightstand.

clues as to what substance, if any, appellant had taken. Additionally, the medics indicated they had administered Narcan to appellant but had not been able to revive him at that point.

From there, Mattacchione opened the nightstand's drawer and discovered a clear baggie containing a white powdery substance that was later determined to be heroin. She then gave the baggie to Cutburth, who in turn informed the medics of the substance. Appellant was revived a few minutes later, and when asked by medics what substance he took, appellant admitted he had snorted heroin.

On November 6, 2019, appellant was indicted for possessing heroin in violation of Code § 18.2-250. He was also indicted for one count each of possessing psilocybin and possessing methamphetamine in violation of Code § 18.2-250, but the Commonwealth *nolle prosequied* those charges upon a concession that the evidence for them was gathered in violation of appellant's constitutional rights.

Appellant filed a motion to suppress the heroin discovered through the officers' search, arguing that the search violated his Fourth Amendment rights. A hearing on that motion took place on November 7, 2019. There, the parties agreed that the officers' search was warrantless but disputed whether it was nonetheless justified as an emergency act under the community caretaker doctrine. Appellant argued that the doctrine did not justify the officers' search because they exceeded what was reasonably justified by the circumstances in searching the nightstand's drawer. The trial court disagreed and denied the motion on the basis that the community caretaker doctrine justified the officers' warrantless search.

After the suppression hearing, appellant waived his right to counsel and proceeded *pro se*. Prior to trial, appellant filed a motion to dismiss the indictment against him, arguing among other things that Senate Bill 667—later passed as an amendment to Code § 18.2-251.03— precluded his prosecution because (1) another individual sought medical assistance for him in

light of his overdose; (2) he remained at the scene and identified himself to law enforcement after their arrival; and (3) the evidence the prosecution sought to use at trial was obtained as a result of the anonymous tip reporting his overdose and requesting medical attention.

A bench trial took place on September 29, 2020. At the outset of trial, appellant re-asserted the argument made in his motion to dismiss, although this time he relied on the statutory amendment rather than the Senate Bill. In response, the trial court noted that the "offense date precede[d] the change in the law" but asked appellant whether he "ha[d] a question" for the court regarding the issue. Appellant stated that because of the statutory amendment, he "d[id not] understand why [he was] still [t]here" but noted that he was not formally renewing his pre-trial motion at that time.

At the close of the Commonwealth's case, appellant noted that he did not intend to introduce his own evidence but said he "would like to show" the trial court a copy of Code § 18.2-251.03. The trial court remarked that it was "familiar with" the statute, as it was "the same statute [they] discussed" in their colloquy at the outset of trial. In his closing argument, appellant again cited to the statutory amendment to Code § 18.2-251.03, noted that he "almost lost [his] life" on the day of the offense, and asserted that he did not "see where convicting [him] on an additional felony . . . [was] really going to solve anything at all." The trial court ultimately convicted appellant for violation of Code § 18.2-250 and sentenced him to five years of incarceration with all but time served suspended.[3]

This appeal followed.

---

[3] The Commonwealth concedes, and this Court agrees, that appellant's written pretrial motion to dismiss, his colloquy with the trial court at the outset of trial, his closing arguments, and the trial court's implicit rejection of appellant's reliance on Code § 18.2-251.03 in convicting appellant were in the aggregate sufficient to satisfy Rule 5A:18.

## II. STANDARD OF REVIEW

Appellant's first assignment of error asserts that the heroin discovered through the search of the nightstand was obtained in violation of the Fourth Amendment and therefore should have been suppressed at trial. That claim presents a mixed question of law and fact that is reviewed *de novo*. Robinson v. Commonwealth, 47 Va. App. 533, 544, 548 n.6 (2006) (*en banc*), aff'd, 273 Va. 26 (2007). Specifically, although this Court gives deference to any findings of historical fact made by the trial court, Harris v. Commonwealth, 276 Va. 689, 694 (2008), it "determine[s] independently whether, under the law, the manner in which the evidence was obtained satisfies constitutional requirements," McCain v. Commonwealth, 261 Va. 483, 489 (2001).

Appellant's second assignment of error asserts that the evidence was insufficient to support his conviction for heroin possession. However, his challenge does not dispute the trial court's findings of historical fact. Instead, appellant alleges that even when conceding all the facts viewed in the light most favorable to the Commonwealth, he could not be found guilty as a matter of law because Code § 18.2-251.03 retroactively protected him from prosecution. Accordingly, this assignment of error presents a pure question of statutory law that this Court reviews *de novo*. See Eley v. Commonwealth, 70 Va. App. 158, 162 (2019).

## III. ANALYSIS

### A. The Trial Court Did Not Err in Denying Appellant's Motion to Suppress

Appellant argues that the evidence of heroin found through the officers' search of the nightstand was obtained in violation of his Fourth Amendment rights. Notably, appellant does not challenge the lawfulness of Cutburth's initial entry into the motel room—which requires that this Court assume without deciding that the entry was constitutional. Instead, appellant narrows the focus of his arguments on the police's conduct in the motel room after the initial entry. To

this end, he contends that the officers' search of the motel room was overly extensive in its scope.  This Court disagrees.

The Fourth Amendment protects individuals against unreasonable searches and seizures.  U.S. Const. amend. IV.  "[W]arrantless searches are *per se* unreasonable, subject to a few specifically established and well-delineated exceptions."  Megel v. Commonwealth, 262 Va. 531, 534 (2001).  Because there is no dispute that the search in this case was conducted without a warrant, the only question for this Court is whether the search was justified by one of the established Fourth Amendment exceptions.

Before fully reaching that question, however, there is a preliminary issue for this Court to address.  The trial court ruled that the officers' search was permissible under the community caretaker exception to the Fourth Amendment's typical warrant requirement.[4]  But just this year, the United States Supreme Court ruled that the community caretaker exception does not extend to warrantless searches and seizures in the home.  Caniglia v. Strom, 141 S. Ct. 1596, 1598 (2021) ("The question today is whether [the Court's prior recognition of law enforcement's] 'caretaking' duties creates a standalone doctrine that justifies warrantless searches and seizures in the home.  It does not.").

The Caniglia Court's holding was premised on a longstanding Fourth Amendment truism:  location matters.  While the community caretaking doctrine arose from the Court's

---

[4] Under certain circumstances, the community caretaker exception permits the police to conduct a warrantless search if it is reasonable for them to believe the search is necessary for:  "(1) the protection of the owner's property while it remain[s] in police custody; (2) the protection of police against claims or disputes concerning lost or stolen property; or (3) protection of the public and the police from physical danger."  Knight v. Commonwealth, 61 Va. App. 297, 306 (2015).  If any one of those circumstances is present, then three additional requirements must be met in order for a search to be constitutional under the exception:  "(1) the officer's initial contact or investigation [must have been] reasonable; (2) the intrusion [must have been] limited [in scope]; and (3) the officer [cannot have been] investigating criminal conduct under the pretext of exercising his community caretaker function."  Commonwealth v. Waters, 20 Va. App. 285, 290 (1995).

Fourth Amendment jurisprudence on police patrols, searches, and seizures on "public highways," the Court never once intimated that the doctrine could justify warrantless entries and searches of the home. Id. at 1599 (emphasizing that the Court's community caretaking precedent "repeatedly stressed" that searches in the home represent a significant "constitutional difference" (quoting Cady v. Dombrowski, 413 U.S. 433, 439 (1973))).

Notwithstanding that fact, the intermediate appellate court in Caniglia (the First Circuit) applied a "freestanding community-caretaking" doctrine to warrantless searches in the home which simply required that two elements be met for an officer's entry and search to be considered lawful: (1) that the officer be performing work that was distinct from the normal work of criminal investigation and (2) that the officer's conduct fall within the "realm of reason" and "sound police procedure." Id. That "freestanding" approach, the Supreme Court reasoned, went "beyond anything th[e] Court has recognized" and failed to consider that "[w]hat is reasonable for vehicles is different from what is reasonable for homes." Id. at 1599-1600. The Court consequently reversed the First Circuit's judgment and clarified that law enforcement's community caretaking duties do not give it license to conduct warrantless searches and seizures in a home.[5] Id.

In this case, the search took place in a motel room rather than a home. But in all aspects relevant to this appeal, that is a distinction without a difference, as "[t]he [F]ourth [A]mendment rights of a guest in a motel room are [generally] equivalent to those of the rightful occupants of a house." See Servis v. Commonwealth, 6 Va. App. 507, 516 (1988) (citing Stoner v. California, 376 U.S. 483, 490 (1964)); Hoffa v. United States, 385 U.S. 293, 301 (1966) ("A hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office."). Given

---

[5] In doing so, the Caniglia Court recognized that other Fourth Amendment doctrines—for example, the emergency aid doctrine—still permit law enforcement to conduct warrantless searches and seizures of the home under the right circumstances. 141 S. Ct. at 1599.

that principle, and because Caniglia made clear that the community caretaker exception does not apply to warrantless searches of the home, this Court holds that the exception does not apply to motel rooms either. As a consequence, this Court determines the trial court erred in relying on the community caretaker doctrine to deem the officers' search of appellant's motel room lawful.

But an acknowledgement that the trial court relied on the wrong doctrine does not mean this Court determines its *judgment* was in error. See Evans v. Commonwealth, 290 Va. 277, 288 n.12 (2015) ("Appellate courts do 'not review lower courts' opinions, but their *judgments*.'" (quoting Jennings v. Stephens, 574 U.S. 271, 277 (2015))). Instead, because the Commonwealth has invoked the "right result, wrong reason" doctrine, this Court's task is to ensure there is not a different reason which supports the conclusion that the officers' search was lawful under the Fourth Amendment. See Perry v. Commonwealth, 280 Va. 572, 579 (2010) ("Under the right result for the wrong reason doctrine, 'it is the settled rule that how[ever] erroneous . . . may be the reasons of the court for its judgment upon the face of the judgment itself, if the judgment be right, it will not be disturbed on account of the reasons.'" (alterations in original) (quoting Schultz v. Schultz, 51 Va. 358, 384 (1853))).

The alternative reason offered by the Commonwealth here is the emergency aid exception,[6] an exception the Virginia Supreme Court has determined is still applicable to warrantless searches of the home post-Caniglia. Merid v. Commonwealth, 300 Va. 77, 77 n.* (2021) (per curiam order) (noting the Virginia Court of Appeals' reliance on the emergency aid doctrine in determining the constitutionality of warrantless searches of the home is "consistent

---

[6] The Commonwealth would not be permitted to rely on the "right result, wrong reason" doctrine if "development of additional facts" was necessary to determine whether the emergency aid exception upholds the trial court's judgment. Spinner v. Commonwealth, 297 Va. 384, 391 (2019). Since the transcript from the suppression hearing and the body camera footage supply all the facts necessary to determine whether the emergency aid exception applies here, however, this Court determines that the Commonwealth's reliance on the "right result, wrong reason" doctrine is permissible.

with Caniglia"). That exception permits the police to "'enter and investigate' when someone's health or physical safety is genuinely threatened." Kyer v. Commonwealth, 45 Va. App. 473, 480 (2005) (*en banc*) (quoting Reynolds v. Commonwealth, 9 Va. App. 430, 437 (1984)); see also Brigham City v. Stuart, 547 U.S. 398, 403 (2006) ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.").

In order for the emergency aid exception to apply, two conditions must be met. First, to justify entry into a residence, the police must have an objectively reasonable basis for believing that someone in the residence needs immediate aid. Michigan v. Fisher, 558 U.S. 45, 47 (2009) (per curiam). Second, the scope of any search conducted by the police once lawfully inside a residence must be "strictly circumscribed by the exigencies which justify its initiation." Mincey v. Arizona, 437 U.S. 385, 392 (1978) (quoting Terry v. Ohio, 392 U.S. 1, 26 (1968)).

Given appellant's decision to forego challenging Cutburth's initial entry into the motel room, this Court's only task is to determine whether the scope of the officers' search was appropriately circumscribed by the emergency before them: appellant's overdose. To accomplish that task—as with any task under the Fourth Amendment—this Court looks to practical, real-world notions of reasonableness for guidance rather than "precise" or "mechanical" legal rules. See Saal v. Commonwealth, 72 Va. App. 413, 436 (2020) (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)); see also Merid v. Commonwealth, 72 Va. App. 104, 114 (2020) (noting that the "over-arching principle" of Fourth Amendment analysis is "reasonableness" rather than "line drawing").

When the police entered the motel room, appellant was unconscious, pale in the face, cool to the touch, sweating profusely, and struggling to breathe. Based on their collective experience dealing with numerous overdose cases, the officers believed appellant was suffering

- 9 -

from an overdose. So naturally, they began to look for clues to not only confirm that belief but also to determine *what* substance appellant had taken. To do so, they first conducted a cursory sweep of the motel room to see what they could find in plain view. Under this Court's precedent, that first step was entirely reasonable. See Merid, 72 Va. App. at 116-17 ("[O]fficers may conduct a cursory sweep of [a] residence after entering pursuant to the emergency aid exception . . . .").

When that step shed no light on the cause of appellant's condition—and appellant was, at that moment, not responding to Narcan treatment—the officers took a step further by searching the drawer of the nightstand in between the motel room's beds. Extensive though that action may have been, this Court cannot say it was a step beyond what the circumstances before the officers reasonably required.

While the nightstand was not within the space immediately surrounding appellant, it certainly was close. Cf. id. at 114 ("[This Court] will not impose a bright-line rule that would confine the police to the immediate physical space surrounding the emergency when they have entered to provide aid."). And because appellant was lying unconscious on the floor on the other side of the bed, a reasonable inference—perhaps the most reasonable—was that he was on the bed prior to that state. If that were true, the officers could have reasonably suspected that because a cursory survey of the room provided no clues as to the cause of appellant's condition, a search of the nightstand next to the bed would. In fact, it very likely would have been irresponsible for the officers *not* to have searched the nightstand when considering that appellant's life was still in danger and EMS personnel had not identified the cause of appellant's circumstances. See id. at 117-18 (noting it would have "been irresponsible" for officers to not have done a cursory survey of an apartment to ensure that "other occupants were safe and

secure" following the apprehension of a person who engaged in "an especially violent suicide attempt").

The premise underlying the emergency aid exception is the "commonsense rationale that 'preservation of human life is paramount to the right of privacy' protected by the Fourth Amendment." See Kyer, 45 Va. App. at 480 (quoting Reynolds, 9 Va. App. at 437). It would be an affront to that "commonsense rationale" to hold that the Fourth Amendment required the officers to throw up their hands and call it quits once the initial cursory survey provided no clues as to appellant's medical condition.

True, even if the officers had done so in this case, it would not have prevented EMS from abating the emergency, as subsequent Narcan doses eventually proved successful. But while hindsight is 20/20, foresight is not, and this Court will not create a bright-line rule restricting law enforcement to searching areas in plain view when the emergency aid doctrine applies, given that such a ruling could quite literally make the difference between life and death in similar future scenarios. See id.; see also Graham v. Connor, 490 U.S. 386, 396-97 (1989) ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."). Instead, this Court holds that the emergency aid doctrine gives law enforcement some leeway to

search areas beyond what is in plain view[7] and that the officers' search here was within the scope of that leeway.[8]

In short, the scope of the officers' search was strictly circumscribed to the emergency with which they were presented. Accordingly, this Court holds that even though the trial court wrongly relied on the community caretaker doctrine in deeming the officers' search lawful, its judgment in denying appellant's motion to suppress was nonetheless correct given the emergency aid exception's applicability to this case.

### B. Code § 18.2-251.03's Amendments Are Not Retroactive

In his second assignment of error, appellant contends the evidence was insufficient to support his conviction for possessing heroin. He specifically avers that the trial court should have found that Code § 18.2-251.03's bar to prosecution for drug possession applied retroactively and that the facts of the case fell within the scope of that bar. Although appellant is presumably correct in his latter contention, his argument fails on the former basis alone.

Appellant's offense occurred on April 1, 2019. At that point, Code § 18.2-251.03 provided that a defendant accused of possessing a controlled substance had an "affirmative

---

[7] The extent of that leeway in future cases, of course, will be determined on a case-by-case basis, depending on the nature of the emergency and all the factual circumstances that surround it. See Merid, 72 Va. App. at 118 (emphasizing that "the salient point" in determining the lawfulness of the scope of the police's search pursuant to the emergency aid exception is "whether officer conduct is reasonable under *all the circumstances*" (emphasis added)).

[8] This conclusion is similar to conclusions drawn by other courts dealing with more extensive police searches in overdose cases. See, e.g., Stricker v. Township of Cambridge, 710 F.3d 350, 362 (6th Cir. 2013) (holding that officers' search around bedrooms and into drawers and cabinets was "objectively reasonable" because it was "consistent with a search for clues as to what [the overdose victim] ingested, in order to aid EMS in its treatment of [him]"); McKenna v. Edgell, 617 F.3d 432, 444 (6th Cir. 2010) (noting that extensive searches are generally reasonable under the "ordinary circumstances" of an overdose case because they are "consistent with a quest for clues about [a person's] medical condition, information that would be valuable to his treatment").

defense" upon proof of four elements: (1) he faced a life-threatening condition resulting from using the substance and he, in good faith, "s[ought] or obtain[ed]" emergency medical attention for himself; (2) he remained at the scene of the overdose until law enforcement arrived; (3) he identified himself to law enforcement personnel at the scene; and (4) the evidence the prosecution attempted to use to secure a conviction was gathered as a result of him seeking emergency medical attention. Code § 18.2-251.03(B)(1)-(4) (2019). Appellant correctly concedes that he would not have satisfied the first element of this iteration of the statute because he did not report his overdose or seek medical treatment on his own initiative.

On July 1, 2020 (before appellant's trial), the statute was amended in two ways. First, the statute's "it shall be an affirmative defense" phrase was changed to provide that "[n]o person shall be subject to arrest or prosecution" if his conduct falls within the scope of its provisions. Code § 18.2-251.03(B). Second, it supplemented the first element of its bar by providing that a defendant could show *either* that he sought or obtained medical attention for himself *or* that another individual sought or obtained it for him. Code § 18.2-251.03(B)(1)(i)-(ii).

If the current iteration of the statute had applied at trial, it presumably would have protected appellant because (1) another individual sought medical attention for him; (2) appellant remained at the scene until law enforcement arrived; (3) he identified himself to law enforcement after being brought back to consciousness; and (4) the evidence the Commonwealth used against him was gathered because another person sought emergency medical assistance for appellant. But because this iteration was not in effect at the time the offense took place, the only way appellant could have benefited from it is if it applied retroactively.

As a matter of first principles, interpreting a law to apply retroactively is "not favored, and . . . a statute is always construed to operate prospectively unless a contrary legislative intent is manifest." Berner v. Mills, 265 Va. 408, 413 (2003); see also Booth v. Booth, 7 Va. App. 22,

- 13 -

26 (1988) ("[T]he general rule of statutory construction is that legislation only speaks prospectively.").

A legislative intent to make a statute retroactive is "manifest" in one of two circumstances. The first is when the text of the statute contains "explicit terms" demonstrating its retroactive effect. Taylor v. Commonwealth, 44 Va. App. 179, 186 (2004). The second is when the statute's amended terms affect "remedial" or "procedural" rights rather than "substantive" or "vested" rights. Compare Sargent Elec. Co. v. Woodall, 228 Va. 419, 424 (1984) ("A legislative enactment, if purely procedural in nature, may be given retroactive effect . . . ."), and Lackland v. Davenport, 84 Va. 638, 640 (1888) ("The . . . authorities against construing statutes retrospectively when they disturb vested rights do not apply to remedial statutes. By all the authorities, remedial statutes are an exception to the rule."), with Shiflet v. Eller, 228 Va. 115, 120 (1984) ("'[S]ubstantive' rights . . . are included within those interests protected from retroactive application of statutes.").

In circumstances where a statutory amendment effects a change in *both* substance and remedy (or procedure), courts will not give the statute retroactive effect. Pennington v. Superior Iron Works, 30 Va. App. 454, 459 (1999) ("In order for [a] statutory change 'to apply retroactively, . . . it must be procedural in nature and affect remedy *only*, disturbing no substantive right or vested rights.'" (emphasis added) (quoting Cohen v. Fairfax Hosp. Ass'n, 12 Va. App. 702, 705 (1991))).[9] So in the context of this case, even if one could point to aspects of

---

[9] This framework for discerning whether a law should be given retroactive or prospective effect was (and still is) guided by Code § 1-238 and Code § 1-239 (formerly Code § 1-16). Compare Code § 1-238 (providing that a "[r]eenacted" statute supplements "the existing *substantive* provisions" of prior versions of the statute and is "effective *prospectively* unless the bill expressly provides that such changes are effective retroactively on a specified date" (emphasis added)), with Code § 1-239 ("No new act of the General Assembly shall be construed to repeal a former law, as to any offense committed against the former law . . . except that the *proceedings* shall conform, so far as practicable to the laws in force at the time of such

- 14 -

Code § 18.2-251.03's amendments that effected procedural or remedial changes, so long as the amendments effected *any* change in substantive rights, neither the trial court nor this Court would be permitted to apply the statute retroactively. See id.

With these principles in mind, this Court now turns to the specific argument appellant makes regarding the retroactivity of Code § 18.2-251.03's amendments. There is no dispute that the statute does not contain any explicit terms providing for its retroactivity (nor could there be).[10] Furthermore, appellant does not argue that the statute's new provisions affect matters of pure "procedure." Instead, he argues that because the amendments are "remedial," they should have been applied by the trial court.

Appellant's argument is only half right. He correctly points to the fact that while the statute used to provide an affirmative defense to be proved at trial, the statute now mandates that "[n]o individual shall be *subject to arrest or prosecution*" if they meet the statutory elements described above. Code § 18.2-251.03(B) (emphasis added). From that amendment, appellant

---

proceedings." (emphasis added)); see also Smith v. Commonwealth, 219 Va. 455, 476 (1978) (holding that Code § 1-16's use of the word "proceedings" required that "*procedural* provisions of the statute in effect on the date of trial control the conduct of trial insofar as practicable" (emphasis added)).

[10] The statute does not contain any "clear, explicit, and unequivocal language . . . indicating that its provisions should be applied retroactively." See Taylor, 44 Va. App. at 185 (internal quotation marks omitted). While it is true that "the context of the language used by the legislature" rather than any "specific form of words" dictates whether a statute contains explicit retroactive terms, Bd. of Supers. of James City Cnty. v. Windmill Meadows, LLC, 287 Va. 170, 180 (2014), the context of the language used here offers no support to appellant.

For one thing, even if a specific form of words is not required to show a statute's retroactive effect, the fact remains that Code § 18.2-251.03 does not contain any plain retroactive terms. Compare, e.g., Code § 6.2-2504 ("This section shall be given retroactive and prospective effect."). For another, when Code § 18.2-251.03 lists the elements governing when a defendant meets the statute's safe-harbor provisions, it does so in the future tense rather than the past tense. See Code § 18.2-251.03(B)(1)-(4); see also Windmill Meadows, 287 Va. at 181 (noting that Code § 15.2-2303.1:1(A)'s use of past tense language indicated the General Assembly intended its substantive provisions to affect events that occurred prior to the statute's enactment).

also correctly observes that the new language is broader in remedial application than the language that preceded it.

Think, for example, of a person who is arrested and charged for drug possession after seeking medical attention and cooperating with law enforcement after suffering an overdose. Because that person could no longer be "subject to arrest or prosecution" under the current version of the statute, the person would at a minimum be able to seek some sort of pre-trial relief when the prosecution is initiated and need no longer wait until trial to prove an affirmative defense.[11]  In this way, the amended statute provides new forms of relief that it did not before. See Bayless v. Cmty. Coll. Dist. No. XIX, 927 P.2d 254, 255 (Wash. Ct. App. 1996) ("Remedial statutes generally 'afford a remedy, or better or forward remedies already existing for the enforcement of rights and the redress of injuries.'" (quoting Haddenham v. State, 550 P.2d 9, 12 (Wash. 1976))).

But the statute's new "no arrest or prosecution" provision cannot be read in isolation.  If it were, one might reasonably (but mistakenly) be led to ask, "since the statutory change was enacted before appellant's trial and while the prosecution was still ongoing, does that not warrant a *prospective* application of the statute to give effect to the new 'no prosecution' language, resulting in dismissal of the case?"

That question takes this Court to the wrong half of appellant's argument, or the part of it that misses the *substantive* changes in Code § 18.2-251.03's amendments.  A law affects substantive rights if it "deals with [the] creation of duties, rights, and obligations." Shiflet, 228 Va. at 120.  Or perhaps more clearly stated, a law is "substantive . . . if it alters the range of

---

[11] A "prosecution" commences when a formal accusation is made against a person, not at the time of trial.  See Phillips v. Commonwealth, 257 Va. 548, 553 (1999); Sigmon v. Commonwealth, 200 Va. 258, 267 (1958).

conduct or the class of persons" that is punishable under law.  See Schiro v. Summerlin, 542 U.S. 348, 353 (2004).

Code § 18.2-251.03's amendments plainly affected substantive rights because they changed the class of persons and range of conduct that is punishable under law.  At the time appellant suffered his overdose, the law then in effect made clear that appellant's conduct was a crime because he did not personally seek medical assistance during the overdose.  See Code § 18.2-251.03 (2019); Code § 18.2-250.  But after the fact, the General Assembly amended Code § 18.2-251.03 to provide that what appellant did before was no longer considered a crime under Code § 18.2-250[12]; the amendment now not only protects overdose victims who seek self-help in overdose situations, it also protects overdose victims who had help *sought for them* by other persons.

So, if either the trial court or this Court applied Code § 18.2-251.03's new "no prosecution" provision and dismissed this case, it would retroactively alter appellant's substantive rights because it would deem what was a crime at the time of appellant's overdose to no longer be a crime.  See Martin v. Hadix, 527 U.S. 343, 357-58 (1999) ("The inquiry into whether a statute operates retroactively demands a commonsense, functional judgment about 'whether the new provision attaches *new legal consequences to events completed before its enactment*.'" (emphasis added) (quoting Landgraf v. USI Film Prod., 511 U.S. 244, 270 (1994))); cf. State v. Walls, 775 N.E.2d 829, 841 (Ohio 2002) (hinging a retroactivity analysis under the Federal Constitution's ex post facto clause on whether legislative changes "subject[ed] a

---

[12] Reading Code § 18.2-250 and Code § 18.2-251.03 together rather than either statute in isolation is the best way to determine what overdose-related conduct is punishable under law. And it accords with the principle of statutory construction that courts "will not examine statutes as isolated fragments of law, but as a whole, or as parts of a great connected, homogenous system, or a single and complete statutory arrangement."  Cox v. Commonwealth, 73 Va. App. 339, 344 (2021) (internal citations and quotation marks omitted).

defendant to a more severe sentence than was available *at the time of the offense*" (emphasis added)).  And absent explicit legislative directives to the contrary, that retroactive application would be impermissible under longstanding precedent and statutory law.  See supra pp. 13-15.

In short, an accurate characterization of Code § 18.2-251.03's amendments is that they effected *both* a change in remedy and a change in substantive rights.  And that dual nature of the statutory amendments is a roadblock, not an avenue, to applying the statute retroactively.  Pennington, 30 Va. App. at 459.  Accordingly, because the statutory amendments effected substantive changes, and because they did not explicitly provide that they were intended to apply retroactively, the trial court did not err in refusing to apply them here.

### IV.  CONCLUSION

The trial court's denial of appellant's motion to suppress was not in error.  Nor was its determination that Code § 18.2-251.03's amendments did not apply retroactively.  Accordingly, this Court affirms.

Affirmed.